[No. S029453. Nov. 12, 1998.]

THE PEOPLE, Plaintiff and Respondent, v.
RUDOLPH JOSE ROYBAL, Defendant and Appellant.

490

**Counsel**

Barry L. Morris, under appointment by the Supreme Court, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General,

Garrett Beaumont and Janelle Marie Boustany, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**MOSK, J.**—This is an automatic appeal (Pen. Code, § 1239, subd. (b)) from a judgment of death under the 1978 death penalty law (*id.*, § 190 et seq.).

On June 1, 1992, the District Attorney of San Diego County filed an amended information against Rudolph Jose Roybal in the superior court of that county.

Count I charged that, on or about June 10, 1989, defendant murdered Yvonne Weden. (Pen. Code, § 187, subd. (a).) It was alleged for death eligibility that he did so under the special circumstances of (1) felony-murder robbery, and (2) felony-murder burglary. (*Id.*, former § 190.2, subd. (a)(17)(i), (vii), as added by initiative, Nov. 6, 1978.)

Count II charged that, on or about June 10, 1989, defendant committed robbery against Weden in an inhabited dwelling. (Pen. Code, §§ 211, 212.5, subd. (a).)

Count III charged that, on or about June 10, 1989, defendant committed burglary of an inhabited dwelling. (Pen. Code, §§ 459, 460.)

It was further alleged that, during the commission of each of these offenses, defendant personally used a deadly and dangerous weapon, to wit, a knife (Pen. Code § 12022, subd. (b), miscited in the amended information as subd. (d)), and that he inflicted great bodily injury on Weden, a person 60 years of age or older (*id.*, § 1203.09, subd. (a)).

Defendant pleaded not guilty to the charges and denied the allegations.

Trial was by jury. The panel returned a verdict finding defendant guilty as charged of the murder of Weden and fixed the degree at the first. It found true the accompanying allegations of the special circumstances of felony-murder robbery and felony-murder burglary. It also returned verdicts and findings to the effect that he committed robbery and burglary as charged, fixing the degree of each offense at the first. As to each offense, it found that he personally used a knife and that he inflicted great bodily injury on Weden, a person 60 years of age or older. It fixed the punishment for murder at death.

The superior court denied defendant's motion for a new trial and his automatic application for a modification of the verdict (Pen. Code, § 190.4, subd. (e)). For the murder of Weden, it imposed a penalty of death. For the robbery, it imposed the upper term of six years, plus an additional year for the use of the knife; for the burglary, it imposed the upper sentence of six years, but did not impose an additional year for the use of the knife; it ordered the robbery and burglary sentences to be served concurrently to each other and to the death penalty. It stayed execution of the sentences for robbery and burglary temporarily, pending execution of the penalty of death, and permanently thereafter. (*Id.*, § 654.)

As we shall explain, we conclude that the judgment should be affirmed.

## I. FACTS

### A. *Guilt Phase*

The People introduced evidence to the following effect.

In 1989, Yvonne Weden lived with her husband, Paul, in Oceanside. She was 65 years old and suffered from arthritis and loss of hearing and was using crutches because of an injury to her ankle. Paul worked nights at a supermarket; Yvonne usually went to bed around 11:30 p.m. and awoke early. She did not smoke; Paul had quit smoking in January. Even when he smoked, he did not do so in the house; he usually smoked Marlboro brand cigarettes, never Camel brand.

Defendant had lived in Santa Fe, New Mexico, with his mother for most of his life. In April or early May 1989, he lived with his half brother, Frank Orozco, and the latter's family in Oceanside, about a half-mile from the Weden home. He was not permitted to use the car, but he was able to use his brother's bicycle. He smoked Camel brand cigarettes. He earned money doing yard work in Oceanside and helped in his brother's business.

In May 1989, defendant came to the Wedens' home and offered to do yard work, leaving his name and telephone number on a slip of paper. He was hired to perform yard work, mostly pulling weeds, for four days in late May. He stopped working for the Wedens when Paul became dissatisfied with the slowness of the work. The slip of paper with his name and telephone number remained pinned to a bulletin board in the den.

On Thursday, June 8, defendant knocked on the door of the Wedens' neighbor, asking for gardening work. The neighbor, who described him as

appearing aggressive and nervous, did not hire him. The following day, Friday, June 9, he sought work at the home of another Oceanside resident, leaving his name and telephone number.

On June 9, at 7:45 p.m., Paul left the house. He finished work at 7:30 a.m. on June 10, went out for a "couple of beers" with some coworkers, and then, at 8:00 a.m., drove to pick up a new gardener but was unable to locate him. When he returned home, he was unable to open the garage door, his usual entry into the house. When he entered the house, he found his wife lying on the floor of the bedroom in her pajamas; there was blood on the wall and her body was cold. He called 911 around 8:30 a.m.

The front door was unlocked and there was no sign of a forced entry. The slip of paper with defendant's name and telephone number was missing. A Camel brand filter cigarette butt was on the floor of the guest bedroom.

A jewelry box containing Paul's wedding ring, some Masonic rings, and other items, was missing from the master bedroom. The outer box in which it had been kept had a blood smear or stain on it. Some of Yvonne's jewelry was missing, including gold chains and costume jewelry, as was some cash. A pistol and holster were missing from a dresser.

The police arrived. Yvonne was pronounced dead at the scene. There was a bloody laceration around her neck and blood on her pajamas, the walls, and the carpet. Her wedding ring was missing from her finger.

She died from multiple stab wounds. The coroner estimated the time of death as occurring between midnight and 2:00 a.m. An autopsy showed blunt force injuries to her head and multiple stab wounds to her chest, shoulder, hands, and neck. The stab wounds were deep; there was a jagged gaping wound to the neck, and multiple punctures of the lungs, and a rib was fractured by the force of the knife. There were wounds and blood on the palm of her left hand. It was difficult to obtain fingerprints from the hand, because the fingers were clenched.

On the night of June 9, defendant telephoned his mother, Stella Orozco, in New Mexico. He left Oceanside for New Mexico on June 10, around 10:00 p.m, arriving on June 11. When she asked about cuts on his face, he said he had been injured in a robbery earlier the same week or the week before.

Later, she saw him take a plastic produce bag from her kitchen, go into the backyard, and place it in one of the cinder blocks on top of the wall between her yard and that of neighbors. The day after he arrived, he offered to sell

some jewelry to his half sister, Theresa Romero, who lived next door. Theresa called the probation department the next day and told a probation officer that defendant was staying at their mother's house, and that he was selling jewelry.

On June 13, Theresa led police to the back room of Stella's home, where defendant was watching television. In the course of a patdown search, police discovered a small folding knife in his pocket. They also found hypodermic syringes in his sock and marijuana in his pocket. He had a packet of Camel brand filter cigarettes in his shirt pocket. Before he was taken into custody, he left a gold rope chain in the room; as he was removing articles from his pocket to leave behind, a foil packet containing tar heroin fell to the ground. Defendant told police he had been in Seattle for months and had returned to New Mexico to visit his ailing mother; he did not mention that he had been living in Oceanside.

After the police left, Theresa learned from Stella that defendant had hidden something in the wall "right in between everyone's yard." She telephoned the police to say that Stella wanted to turn over some items, and they returned that evening. Stella told them that she wanted them to remove things that were not hers; she gave them several articles, including a folding knife, and asked them to remove the plastic bag that defendant had placed in her backyard wall. The police saw a portion of a plastic bag protruding from a hole in a cinder block. They removed what proved to be two plastic produce bags with green writing on them, containing a paper bag from a Santa Fe drug store. The bags contained jewelry, later identified as including rings and other items belonging to Paul and Yvonne Weden. Stella also gave police a folding knife in a black sheath. They asked her for the gold rope chain he had left behind; she said "Absolutely" and also gave them some of his soiled laundry from the washing machine.

Detective Sheila Hancock, who was investigating the possibility that defendant was involved in the Weden crimes, contacted Santa Fe police to report the homicide in Oceanside involving theft of jewelry. She flew to New Mexico on June 13, and searched the residence of Stella Orozco. She also saw defendant at the police department; she noticed he was smoking Camel brand cigarettes.

Several items, including the cigarette butt, a dinner knife, a jewelry case, a sock, and knives, were tested at the Serological Research Institute in Richmond, California. Both Yvonne Weden and defendant had the same blood type and were both secretors; their blood tested differently in only three genetic markers tested. Researchers at the institute examined the saliva

on the cigarette butt using polymerase chain reaction (PCR) DNA testing. An employee of the institute was of the view that bloodstains from the knife and sock, as well as saliva from the cigarette butt, could have come from defendant, Yvonne Weden, or others with the same DNA characteristics. There were no identifiable fingerprints on the cigarette butt. Blood on the jewelry box had the same blood type as defendant and Yvonne Weden. Microfibers similar to fibers from Yvonne Weden's pajamas were found on defendant's socks and sweatshirt.

A partial print in "orangish-red," possibly blood, was found on a metal doorjamb to the utility room of the Weden residence. Photographs were taken of it, and an attempt was made to lift a fingerprint; the doorjamb was thereafter removed at Detective Hancock's direction for further testing. Attempts were made by an expert to obtain a usable print from the doorjamb, but were unsuccessful. Thereafter, the doorjamb, which was kept after the testing in a locked evidence area in Oceanside, was found to be missing.

For his part, defendant introduced evidence as follows.

On the evening of June 9, both Frank Orozco and his wife were out, and defendant was supposed to watch their children. When Frank returned home, he found defendant "completely and totally inebriated, drunk to the point that he was falling down." This was the first time he had found him drunk at his home. He picked defendant up and led him to the bedroom. His wife was angry and they discussed asking defendant to leave. He checked on defendant an hour later; defendant had "passed out."

On June 10, he awoke defendant around 7:00 or 8:00 a.m. by shaking him. Defendant asked, "What's wrong? What's wrong?" Frank and his wife argued with defendant about his drinking. Defendant complained that Frank's wife was treating him "like a slave" and stated that he wanted to return to Santa Fe. That evening, Frank drove him to the bus depot for the trip to Santa Fe, and gave him money for the ticket and food.

A forensic pathologist estimated that Yvonne Weden had been murdered as early as 8:00 p.m. on June 9 or as late as 4:00 a.m. on June 10. A police detective recalled that he was asked to take defendant's fingerprints and compare them with prints collected at the crime scene, including the doorjamb; he recalled being told there was no match. A fingerprint expert was of the view that the print on the doorjamb was of a finger or thumb, rather than a palm; he was unable to exclude the victim as the maker of the print because of the poor quality of the prints that were taken from her.

Another fingerprint expert concluded that the print on the doorjamb could have been left by someone wearing surgical latex gloves; similar gloves

appeared in a photograph taken after the crime of a trash can outside the side door leading to the Wedens' garage. But he could not tell by looking at the photograph of the print on the doorjamb whether the person who left the print was wearing gloves. Emergency personnel from the Oceanside Fire Department testified that it was standard procedure to wear latex gloves, but they were not usually disposed of at a crime scene. A resident of Oceanside who had hired defendant to do yard work in the spring of 1989 did not remember seeing him use gloves.

A newspaper delivery girl and her father drove past the Wedens' house on June 10, about 6:30 a.m., and noticed two cars in the street near the driveway.

### B. *Penalty Phase*

The People presented evidence in aggravation to the following effect.

Defendant was convicted of six prior felonies in New Mexico,—for larceny, auto burglary, shoplifting, attempted residential burglary, and burglary. He was also involved in four violent incidents in New Mexico.

On September 15, 1976, at 10:30 in the evening, Santa Fe Police Officer Robert Guillen attempted to stop defendant's car, which had jumped the curb. Defendant sped away and was followed, in a high-speed chase, through residential areas of the town. Defendant pulled up to his mother's house. A passenger in his car fired several gunshots at Officer Guillen; defendant backed his car into Guillen, causing Guillen to hit the hood of his patrol car. Another police officer chased defendant, who fled into his mother's house and hid under a bed. After he was pulled out from under the bed, he broke away and attempted to hide behind his mother to avoid arrest.

On July 23, 1982, Curtis Bruce encountered George Cervantes near a store in Santa Fe. An argument ensued about $2 Cervantes owed for marijuana cigarettes. After an exchange of pushes, Bruce ran toward the store. Cervantes and three others, including defendant, followed and a fight ensued. During the fight, defendant sprayed Bruce's arm, neck, and face with silver paint. Someone stabbed Bruce; he managed to flee. Defendant was arrested carrying a can of spray paint and two marijuana cigarettes. It was the same kind of paint defendant would ordinarily "sniff" in order to become "high."

On June 15, 1985, the Santa Fe police, including Officer Joseph Lopez, were telephoned by Stella Orozco about a domestic dispute; she wanted defendant to leave her house after he threatened her with a knife. Officer

Lopez found defendant in the bedroom and told him that Stella wanted him to leave. Angry and intoxicated, defendant responded with loud cursing, but eventually was persuaded to leave. As he left the house, he swore at the police and started coming toward the officers. He resisted arrest, trying to hit them. He was carrying a container of marijuana in his pocket.

On May 11, 1986, Carmen Annette Pacheco, who identified herself as defendant's former girlfriend, went to a Mother's Day dinner with Stella Orozco and Theresa Romero. After she dropped them off at home, she bought two glass bottles of water, for herself and defendant, and went to find him in a park. He had "round, blank, scary eyes" and was "high." He grabbed the bottles, then attacked her, hitting, punching, kicking and throwing her to the ground. She deliberately broke the bottles so he could not use them in his attack. She yelled for help and was assisted by her sister and two friends, who were driving by. Later that evening, defendant told police that "someone had beaten the fuck out of him." They took defendant to the hospital, where Pacheco was also being treated. She declined to press charges and subsequently saw him a few times. Defendant did not remember hitting Pacheco and did not apologize.

As to the murder of Yvonne Weden, the autopsy physician testified that it involved a struggle and numerous stab wounds inflicted over several minutes. There were abrasions on her face and stab wounds to her lungs, armpit, abdominal cavity, windpipe, and a large artery. Several wounds were inflicted while she was no longer moving.

In mitigation, defendant introduced evidence relating to his background and character.

Stella Orozco left school in the third grade and did not learn to read or write. She spent the ages between 13 and 19 first in a convent and then in a reform school in New Mexico. She then worked in California, returning at age 20 to New Mexico, where she married John Orozco. They lived in a one-room house built by her husband, without water or utilities. He could not have children because "he was sterilized or something." They adopted a son, Frank. After John began "gambling and going out on" her, she became pregnant, with defendant, by another man. She offered to give defendant away if John would remain with her, but then decided to keep him. John divorced her before defendant was born and did not return; her mother, who had been living with her, also left.

Stella drank alcohol while she was pregnant with defendant. When he was 18 months old, defendant fell from his crib and broke his front teeth; his aunt took him to the hospital, but his mother refused to come.

Stella was "basically" a "prostitute" when she was not living with a man. The family was poor. She later lived with a truck driver for three years and bore his child, Ralphie. She had another child, Theresa, with Dewie Brazfield, a heavy drinker who beat her every weekend and burned her with a hot knife. He also hit defendant and the other children. Frank, who lived on and off with his grandmother, finally joined the Marines to get away from home.

Defendant was nicknamed "Mojo" or "Mojado"—Spanish slang for "wetback"—by Stella. She did not show him affection, as she did the other children; she never praised him or told him that she loved him. He was a difficult child and frequently truant from school. At one point, he was left alone with his brother Ralphie and began drinking alcohol. He also sniffed paint. By the time he was 21, he had been involved in several drug programs. Stella did not accompany him.

Two former employers testified that defendant was a dependable employee.

Defendant also presented testimony concerning his drug and mental problems.

Lucie Madrid, a certified alcohol counselor, met defendant in 1976 through a residential alcohol treatment program and became his counselor. He participated in the program over a 10-year period. He was "deep in the disease of alcoholism" and had "very little" self-esteem. Once, Madrid found him crying in a park; he described himself as a failure who was unable to make a different life for himself. Madrid, herself a recovering alcoholic, explained that, like defendant, she sometimes had blackouts, for as long as eight days.

Nan Busby knew defendant from Seadrunar, a drug and narcotics treatment center in Seattle, which he attended from June 1987 until February 1989. She described him as shy and withdrawn at first, but eventually more expressive about his feelings. He had several relapses during the program and left the aftercare program after four days.

James Blackmer, a judge and former prosecutor, prosecuted defendant in 1986 for four pending felony cases. Defendant pleaded guilty to charges including auto burglary, shoplifting, attempted residential burglary, and burglary. After he was evaluated by the New Mexico Department of Corrections, he was sentenced to a term of eight years, six months, which was suspended on the condition that he enter a residential drug program. He

enrolled at Seadrunar, which Blackmer described as "often tougher than going to prison."

Timmen Cermak, M.D., a psychiatrist, evaluated defendant and his family. He found that defendant had significant impairment from brain dysfunction, a schizoid personality structure, and was profoundly chemically dependent since age nine, resulting in disruption of his personality development. Intelligence testing indicated organic-based learning disabilities. Cermak considered it likely that defendant had organic brain damage, possibly the result of fetal alcohol effects, but did not believe he met the criteria for diagnosis as an "anti-social personality." Defendant also suffered "psyche numbing" as the result of physical and emotional abuse. He experienced memory blackouts since the age of nine, when he starting sniffing glue and using alcohol. Regarding the time of Yvonne Weden's murder, defendant told Dr. Cermak that he took drugs on "Thursday" and "the next thing he remembered was getting off the bus in Santa Fe." He said that he had "absolutely no idea how he got the jewelry."

In rebuttal, the prosecution presented the testimony of Steven Bucky, Ph.D., a clinical psychologist. Bucky reviewed Dr. Cermak's report and a videotaped interview of Stella Orozco but did not personally interview defendant or his family and did not review the trial testimony of Stella or Frank Orozco. In his opinion, defendant had a long-standing multi-polysubstance abuse problem and a personality disorder "closely aligned to an anti-social personality disorder." He disputed Dr. Cermak's conclusions that defendant's alcoholism was genetic and that defendant suffered from a schizoid personality or posttraumatic stress syndrome. It was his view that defendant suffered from a "mild, subtle brain dysfunction" caused by substance abuse.

## II. GUILT ISSUES

Defendant raises a number of claims attacking the judgment as to guilt. As will appear, none is meritorious.

### A. *Motion to Continue Kelly-Frye Hearing*

In April 1992, defendant filed a motion *in limine* to exclude DNA evidence, including PCR analysis of saliva on the cigarette butt found on the floor in the Wedens' home on the ground that the prosecution had not established an adequate foundation, under *People v. Kelly* (1976) 17 Cal.3d 24 [130 Cal.Rptr. 144, 549 P.2d 1240] and *Frye v. United States* (D.C. Cir. 1923) 293 F. 1013 [54 App.D.C. 46, 34 A.L.R. 145], as to the general

acceptance of PCR analysis in the scientific community. He subsequently moved to continue the hearing in order to obtain an expert to review a report, recently discussed in a New York Times article, by the National Research Council of the National Academy of Sciences on the use of DNA evidence in court proceedings (NRC, DNA Technology in Forensic Science; hereafter the NRC report).

The superior court set an evidentiary hearing on the *Kelly-Frye* issue for May 18-19. Defendant moved to continue the hearing until June 15 on the ground that his expert would not be available until then and needed additional time to review the NRC report and the materials in the case. He submitted a declaration from an expert who was *not* available to testify, opining that it was "essential that the DNA testing performed . . . [in the case] is assessed with respect to the recommendations promulgated by the NRC." The prosecution asserted that it would suffer prejudice if the trial were continued.

At the hearing on the motion for continuance, defense counsel informed the superior court that an expert had been located who would be able to testify in the middle of June, and he was "trying to get in touch with" another expert. He argued that an expert was needed to assess the laboratory work "in light of the [NRC] report" and for "assistance in cross-examination." The superior court denied the motion, stating that it had "enough evidence to make a decision, or argument at least." It agreed, however, to consider a request at the hearing to take the matter under submission so that defendant could bring in an expert.

At the *Kelly-Frye* hearing, the prosecution presented testimony concerning DNA evidence. Brian Wraxall, the executive director and chief forensic serologist at the Serological Research Institute, which tested the cigarette butt, testified that PCR DNA testing is generally accepted within the scientific community. He stated that he was familiar with the NRC report, including the sections discussing PCR, that he had followed the guidelines and procedures advocated in the report, and that he had conducted testing of evidence in this matter in compliance with the NCR recommendations. He explained that the report did not recommend a moratorium on forensic use of PCR DNA evidence, as incorrectly reported in the New York Times article. Indeed, the chairman of the committee that released the NCR report repudiated the article as a serious misrepresentation of the report's conclusions.

Defense counsel renewed the request for a continuance to present witnesses "when we can get them here, which may not be until June." He conceded: "This expert has not yet seen the report, so I don't know for sure

what he will testify to. But based on my conversation with other experts who will not be testifying here, I believe the defense is going to be able to present an expert whose conclusion would be—will be that the NRC report recommends a moratorium of forensic use of PCR DNA evidence." The superior court denied the request: "We have a trial set, and I have enough information to make a ruling at this point." With regard to the NRC report it stated: "The NRC report by way of offer of proof from the defense, they contend doesn't mean what it says. The best evidence really is the report . . . . [A] plain reading of the report . . . [is that PCR testing] is a generally accepted means of trying to . . . type, identify and exclude DNA type evidence in forensic matters. The report concludes that as well. I mean that's very clear." The court was also "satisfied" that the laboratory, in general, had followed the protocols suggested by the NRC.

■ Defendant argues that the superior court erred in denying his request for a continuance. The claim is without merit.

■ The decision whether to grant a continuance of a hearing to permit counsel to secure the presence of a witness rests in the sound discretion of the trial court. (*People* v. *Howard* (1992) 1 Cal.4th 1132, 1171 [5 Cal.Rptr.2d 268, 824 P.2d 1315]; *Owens* v. *Superior Court* (1980) 28 Cal.3d 238, 250-251 [168 Cal.Rptr. 466, 617 P.2d 1098].) "To establish good cause for a continuance, defendant had the burden of showing that he had exercised due diligence to secure the witness's attendance, that the witness's expected testimony was material and not cumulative, that the testimony could be obtained within a reasonable time, and that the facts to which the witness would testify could not otherwise be proven." (*People* v. *Howard*, *supra*, 1 Cal.4th at p. 1171.)

■ No error appears under that standard. Defendant sought a continuance in order to obtain an expert who was unavailable until June to review the NRC report, or to locate another possible expert to do so. He merely "believed" that his expert—who had not yet read the report—would testify that the NRC report recommended a moratorium on use of the PCR technique. He failed to carry his burden of establishing good cause. As the superior court concluded, his "belief" was apparently ill-founded: the NRC report recommended continued use of DNA analysis for forensic purposes and expressly stated that there was no need for a general moratorium on the use of DNA testing results.[1]

As to the further point defendant intended to pursue with an expert—whether the laboratory actually followed the NRC recommendations in every

[1]*People* v. *Morganti* (1996) 43 Cal.App.4th 643, 665, footnote 16 [50 Cal.Rptr.2d 837], quotes the following committee statement found at the beginning of the NRC report: " 'We recommend that the use of DNA analysis for forensic purposes, including the resolution of

particular—the People contend that it did not involve the "fundamental validity" of the scientific method in question, and hence did not go to the admissibility of the evidence under the *Kelly-Frye* rule. For this, they cite *People* v. *Farmer* (1989) 47 Cal.3d 888, 913 [254 Cal.Rptr. 508, 765 P.2d 940], in which we explained that "the *Kelly-Frye* rule tests the fundamental validity of a new scientific methodology, not the degree of professionalism with which it is applied."

As we recently explained in *People* v. *Venegas* (1998) 18 Cal.4th 47, 78 [74 Cal.Rptr.2d 262, 954 P.2d 525], under the *Kelly-Frye* rule the proponent of evidence derived from a new scientific methodology must satisfy *three* prongs, by showing, first, that the reliability of the new technique has gained general acceptance in the relevant scientific community, second, that the expert testifying to that effect is qualified to do so, and, third, that " 'correct scientific procedures were used in the particular case.' " We emphasized that the rule to which we referred in the above quoted language from *Farmer* is only "*the first prong* of the *Kelly* test" and did not eliminate the independent viability of the third prong. (18 Cal.4th at p. 80, original italics.) When, as in DNA testing, the reliability of the technique employed is not readily apparent to lay observation or experience, *Kelly-Frye* requires determination "whether a laboratory has adopted correct, scientifically accepted procedures" for conducting the test. (18 Cal.4th at p. 81.) "Consideration and affirmative resolution of these questions constitutes a prerequisite to admissibility under the third prong of *Kelly*." (*Ibid.*)

Again, however, we discern no abuse of discretion, under the circumstances, for the superior court to have denied defendant's request for a continuance to obtain additional expert testimony on this point. As discussed, defense counsel's vague expressions of hope that an appropriate expert could be found and made available without undue delay were not encouraging. We note that the testimony in the trial did not begin until June 22, a week after the date to which defendant asked to continue the hearing on the *Kelly-Frye* motion. If he had belatedly gathered significant additional evidence on the *Kelly-Frye* issue after the hearing and before trial, it is reasonable to infer that he would have moved for reconsideration. In any event, any error in denying a continuance was clearly harmless. The DNA

both criminal and civil cases, be continued while improvements and changes suggested in this report are being made. There is no need for a general moratorium on the use of the results of DNA typing either in investigation or in the courts.' "

test results ultimately admitted at trial were so inconclusive that they could not have harmed defendant's case.[2]

### B. *Motion to Suppress*

At the preliminary hearing, defendant's half sister, Theresa Romero, and Officer Segura testified to the following effect. Defendant arrived unexpectedly in Santa Fe, on June 10, 1989. He appeared to be on drugs. His mother, Stella Orozco, was fearful for her safety because he had previously threatened to stab her. The following day, he offered to sell jewelry to Romero. Stella saw him take a plastic produce bag from her kitchen and, after rolling something in it, place it in a cinder block on top of a peripheral wall separating her backyard from other properties. On June 12, Romero telephoned the probation department, asking if defendant was still on parole and reporting that he was "pretty messed up and he was selling some jewelry."

On June 13, with the cooperation of Romero and Stella Orozco, Officer Segura arrested defendant in Stella's bedroom, based on an outstanding parole violation. Defendant was found to be in possession of narcotics. Later the same day, Romero telephoned police after Stella told her that defendant had hidden something in the wall behind the house and, fearing it was contraband, she wanted it removed. Stella led Officer Segura to the wall and asked him to remove the plastic bag, which was protruding visibly from the top of the cinder block. The bag was of clear plastic with lettering on it—"the type of bag you get when you buy produce at any supermarket"; it was rolled around a used "pharmaceutical-type" white paper bag from a Santa Fe drug store. The bags were unrolled and opened by Officer Segura, and were found to contain jewelry.

In a pretrial motion under Penal Code section 1538.5, defendant contended that his rights under the Fourth Amendment of the United States Constitution were violated by the seizure of the jewelry. The prosecution argued that defendant did not have a reasonable expectation of privacy under the circumstances and that the evidence would inevitably have been discovered either by the Santa Fe police, who could reasonably have believed the bag contained drugs or paraphernalia, or by Detective Hancock, in connection with her investigation of the death of Yvonne Weden. The superior court denied the motion.

Defendant contends that the superior court erred in failing to suppress the jewelry, which was seized in violation of his Fourth Amendment

---

[2]Defendant also claims that the superior court's error resulted in violation of his right to due process of law, effective assistance of counsel, and a reliable penalty determination under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. The points are lacking in merit. The superior court did not abuse its discretion; there is thus no predicate error on which to base the constitutional claims.

rights. The ruling, which was based on uncontested evidence, is subject to independent review. (*People* v. *Williams* (1988) 45 Cal.3d 1268, 1301 [248 Cal.Rptr. 834, 756 P.2d 221].) No error appears.

■ An illegal search or seizure violates the federal constitutional rights only of those who have a legitimate expectation of privacy in the invaded place or the seized thing. (*United States* v. *Salvucci* (1980) 448 U.S. 83, 91-92 [100 S.Ct. 2547, 2552-2553, 65 L.Ed.2d 619]; *Rakas* v. *Illinois* (1978) 439 U.S. 128, 143 [99 S.Ct. 421, 430, 58 L.Ed.2d 387].) The legitimate expectation must exist in the particular area searched or thing seized in order to bring a Fourth Amendment challenge. (*Rakas* v. *Illinois, supra,* 439 U.S. at pp. 148-149 [99 S.Ct. at p. 433.) Defendant bears the burden of showing a legitimate expectation of privacy. (*Rawlings* v. *Kentucky* (1980) 448 U.S. 98, 104 [100 S.Ct. 2556, 2561, 65 L.Ed.2d 633].) Among the factors to be considered are " ' "whether the defendant has a [property or] possessory interest in the thing seized or the place searched; whether he has the right to exclude others from that place; whether he has exhibited a subjective expectation that it would remain free from governmental invasion, whether he took normal precautions to maintain his privacy and whether he was legitimately on the premises." ' " (*People* v. *Hernandez* (1988) 199 Cal.App.3d 1182, 1189 [245 Cal.Rptr. 513].)

In *People* v. *Root* (1985) 172 Cal.App.3d 774, 779 [218 Cal.Rptr. 182], the Court of Appeal concluded that the defendant did not have a legitimate expectation of privacy in an opaque plastic bag, containing narcotics, left on the floor of another person's car. "Although a determination of expectation of privacy should not be made based on a distinction between 'worthy' and 'unworthy' containers, an appraisal of the container is nevertheless a circumstance manifesting the scope of an individual's expectation of privacy; thus a reasonable expectation of privacy may be found in a paper bag stapled shut and marked 'private' or in a cardboard box stacked on top of two pieces of heavy luggage. [Citation.] The container in this case was an opaque plastic bag of the type given to customers to hold their retail purchases. . . . [T]he bag was rolled up, or partially rolled up when removed from [the] car; nowhere in the record is there evidence that the container was tied, stapled, taped shut or otherwise sealed from outside view, so as to indicate [the defendant's] expectation of privacy as to the contents of the bag."

■ As defendant concedes, Stella Orozco had authority to consent to the search of her property and to direct police to the bags. Similar to the bag in *Root*, the bags here were the type given to customers to hold retail purchases; they were simply rolled up around stolen jewelry and placed in a wall adjacent to neighboring properties, where they were visible and accessible to passersby. In effect, defendant had abandoned the items. Under the

circumstances, he fails to carry his burden of establishing that he had a legitimate expectation of privacy either in the area searched or as to the contents of the bags.

### C. *Motion to Dismiss*

During the search of the Weden residence, police found an "orangish-red" print on a doorjamb. The print was photographed and, after unsuccessful attempts to lift it, the doorjamb was removed for further analysis. When defense counsel later sought to view the doorjamb, it was missing from the police department facility where it had been stored after testing.

Defendant moved to dismiss or, in the alternative, for sanctions, on the grounds that the prosecution had lost or destroyed exculpatory evidence in violation of the due process clause of the Fourteenth Amendment, and that comparable evidence could not be obtained by other reasonable means. Both the defense and the prosecution subpoenaed numerous witnesses to testify at the hearing on the motion. At the hearing, the superior court determined that, to "streamline" the procedure, defendant would first be required to make an offer of proof, which the court would take "at face value" subject to further examination; the prosecution would then be permitted to rebut the offer of proof through the testimony of witnesses, who would also be available for cross-examination by defendant. Defense counsel reluctantly agreed to the procedure: "I'm only hesitant because of the nature of the proof, your honor. The quality of my talking to the court versus live testimony is a concern to me. And, as you've indicated, you have the power in this courtroom to decide. And I still have my reservations about proceeding this way; but I will, if that's the court's desire."

Defendant's offer of proof was to the effect that the print "was believed to have been made by the person who committed the homicide or by a person involved," and that analysis showed that it was not defendant's print. Police were subsequently unable to produce the doorjamb for inspection by the defense because it was missing.

With the exception of two witnesses—Lee Smith, an expert in fingerprint comparison who purportedly would have testified that the photograph was limited in usefulness compared to the doorjamb itself, and Prosecutor James Koerber, who purportedly would have been asked why it took two years to arraign defendant formally on murder charges—all of defendant's proposed witnesses were called by the prosecution and cross-examined by defendant. Their testimony regarding the identity of the print was to the effect that attempts to lift the print from the doorjamb were unsuccessful, but the

photographs of the print were of sufficient quality for comparison purposes. Based on analysis of the photographs, the print could not be positively identified as belonging to defendant, but neither could defendant be eliminated as a donor. The superior court denied defendant's request to permit his expert, Smith, to sit in on the testimony of one of the prosecution's witnesses on this point, Joe Sypnicki, a print examiner for the Department of Justice.

The testimony of the prosecution's witnesses as to the disappearance of the doorjamb was to the effect that it was routinely booked into the Oceanside Police Department but disappeared during the time when the police department moved its evidence facilities. Police personnel made several unsuccessful searches to locate the item.

At the close of the prosecution's presentation of evidence, the superior court asked defendant whether he wished to present a "[w]itness or evidence on behalf of the defense." Defendant declined: "We rest, your honor, after submitting what's been submitted."

The superior court ruled that the print had "no exculpatory value for the defendant" because it was not of sufficient quality to determine whether it matched defendant's prints. It also ruled that there was no bad faith by the police: "[T]his is probably an administrative screw up . . . . [T]his door jamb has been somehow misplaced or misfiled."

At trial, witnesses for both the defense and the prosecution testified that there was not a match between the print on the doorjamb and defendant's fingerprints. Defendant's witnesses included expert Smith, who also testified that the print was not defendant's. At the close of evidence, defendant verbally requested an instruction to the effect that the police department's loss of the doorjamb made testing the print for blood impossible and police error prevented use of various forensic methods to enhance the print. The superior court rejected the proposed instruction as argumentative, but did not preclude defendant from submitting a written proposed instruction concerning the doorjamb. Defendant did not do so.

■ Defendant claims the superior court erred in failing to impose sanctions based on the disappearance of the doorjamb. The claim is without merit.

■ Law enforcement agencies have a duty, under the due process clause of the Fourteenth Amendment, to preserve evidence "that might be expected to play a significant role in the suspect's defense." (*California* v. *Trombetta* (1984) 467 U.S. 479, 488 [104 S.Ct. 2528, 2534, 81 L.Ed.2d 413]; accord,

*People* v. *Beeler* (1995) 9 Cal.4th 953, 976 [39 Cal.Rptr.2d 607, 891 P.2d 153].) To fall within the scope of this duty, the evidence "must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." (*California* v. *Trombetta, supra,* 467 U.S. at p. 489 [104 S.Ct. at p. 2534]; *People* v. *Beeler, supra,* 9 Cal.4th at p. 976). The state's responsibility is further limited when the defendant's challenge is to "the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." (*Arizona* v. *Youngblood* (1988) 488 U.S. 51, 57 [109 S.Ct. 333, 337, 102 L.Ed.2d 281].) In such case, "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." (*Id.* at p. 58 [109 S.Ct. at p. 337]; accord, *People* v. *Beeler, supra,* 9 Cal.4th at p. 976.)

On review, we must determine whether, viewing the evidence in the light most favorable to the superior court's finding, there was substantial evidence to support its ruling. (*People* v. *Griffin* (1988) 46 Cal.3d 1011, 1022 [251 Cal.Rptr. 643, 761 P.2d 103].) ▮▮ Under that standard, the superior court did not err in concluding that the evidence at issue did not possess an exculpatory value that was apparent before it disappeared; the print may or may not have been defendant's and may or may not have been the perpetrator's. Nor did it err in concluding that the disappearance of the doorjamb was inadvertent and not the product of bad faith conduct by the police; indeed, nothing in defendant's offer of proof disputed such a conclusion.[3]

Defendant also claims that the superior court erred by refusing to permit him to call witnesses or to allow his expert to observe the examination of the prosecution's expert, by limiting cross-examination of Sypnicki about specific forensic techniques, and by refusing to give his proposed instruction. The claims are unavailing; the superior court properly concluded that the evidence did not, in any event, have apparent exculpatory value. Moreover, the record reveals that, although the prosecution was permitted to present its witnesses first, defendant was not precluded from presenting his case or from examining most of the witnesses mentioned in his offer of proof; he did

---

[3]Defendant did not seek to present additional witnesses or evidence after the prosecution rested. The only witnesses referred to in the offer of proof who did not testify at the hearing were Smith and Koerber. Smith's testimony, which, according to the offer of proof, would have been to the effect that the doorjamb itself was more useful than a photograph of the print because the detail would be sharper, was not inconsistent with the superior court's conclusion that the missing evidence did not have apparent exculpatory value. Koerber's testimony, which, according to the offer of proof, would have concerned the purported delay in arraigning defendant on murder charges, was also not inconsistent with that conclusion.

not seek to present additional witnesses after the prosecution rested. As defendant concedes, the superior court had discretion to regulate the order of proof. (Evid. Code, § 320.) Nor did the superior court abuse its discretion by excluding all witnesses from the courtroom during Sypnicki's testimony (see Evid. Code, § 777 [with limited exceptions, "the court may exclude from the courtroom any witness not at the time under examination so that such witness cannot hear the testimony of other witnesses"]), or by limiting the cross-examination of Sypnicki about forensic techniques on relevance grounds. In light of its conclusion that the evidence did not have apparent exculpatory value, it was also not error for the superior court to refuse defendant's proposed instruction on the ground that it was argumentative.[4]

### D. *Right to a Speedy Trial*

Defendant was arrested in New Mexico on June 13, 1989, on an outstanding warrant for violation of probation and sentenced to a term of four years' imprisonment. On June 16, 1989, a complaint was issued charging defendant with the burglary of the Weden residence. On March 18, 1991, he was charged by an amended complaint with the murder and robbery of Yvonne Weden. He was arraigned on June 16, 1991.[5]

On April 10, 1992, defendant moved to dismiss on the ground that the delay deprived him of his right to a speedy trial under the Sixth Amendment of the United States Constitution and article I, section 15 of the California Constitution. He argued that the "most apparent prejudice" he suffered was "the impairment of his ability to recall and to secure evidence of his

---

[4]Defendant claims that he was denied effective assistance of counsel under the federal and state Constitutions because his counsel failed to request an appropriate instruction permitting the jurors to draw an adverse inference from the disappearance of the doorjamb. "Under both the Sixth Amendment to the United States Constitution and article I, section 15, of the California Constitution, a criminal defendant has the right to assistance of counsel. [Citations.] The ultimate purpose of this right is to protect the fundamental right to a trial that is both fair in its conduct and reliable in its result [Citations.] [¶] Construed in light of its purpose, the right entitles the defendant not to some bare assistance but rather to *effective* assistance." (*People* v. *Ledesma* (1987) 43 Cal.3d 171, 215 [233 Cal.Rptr. 404, 729 P.2d 839], original italics.) To establish entitlement to relief, defendant must show deficient performance under an objective standard of professional reasonableness and prejudice under a test of reasonable probability of a different outcome. (*Id.* at pp. 215-218.) For the reasons discussed, there are no grounds for establishing deficient performance; the evidence lacked apparent exculpatory value. In addition, defendant asserts violation of his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and article I, sections 15, 16, and 17 of the California Constitution. The claims are predicated on alleged state law error; because, for the reasons discussed in the text, we discern no such error, the constitutional claims necessarily also fail.

[5]Trial was originally scheduled for September 10, 1991, but was continued, on defendant's motions, until June 3, 1992.

activities at the time of the events in question or establish the culpability of others." The prosecution countered that the delay was "only for such a period of time as it took for valid scientific and technical procedures." The superior court denied the motion, ruling that the claim of prejudice was "fairly speculative."

Defendant renews his claim that the delay between the issuance of the initial complaint and his arraignment violated his federal and state constitutional rights to speedy trial. The point fails.[6]

The Sixth Amendment provides, in relevant part: "In all criminal prosecutions, the accused shall enjoy the right to a speedy . . . trial . . . ." The right attaches only on the filing of an accusatory pleading, such as an "indictment or information." (*United States* v. *Marion* (1971) 404 U.S. 307, 320 [92 S.Ct. 455, 463, 30 L.Ed.2d 468].)[7] In *Barker* v. *Wingo* (1972) 407 U.S. 514, 530 [92 S.Ct. 2182, 2192, 33 L.Ed.2d 101], the United States Supreme Court held that, when the right attaches, the determination whether it has been abridged can be determined only on an ad hoc basis, by weighing and balancing the conduct of the prosecution and the defendant. It identified four factors that courts should assess in determining whether a particular defendant has been deprived of his right: "Length of the delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." (*Ibid.*) "Prejudice, of course, should be assessed in the light of the interests of defendants which the speedy trial right was designed to protect. This Court has identified three such interests: (i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." (*Id.* at p. 532 [92 S.Ct. at p. 2193]; *Doggett* v. *United States, supra,* 505 U.S. 647, 655 [112 S.Ct. 2686, 2692-2693] [an eight-and-one-half-year delay, with six years directly attributable to the government's negligence, was presumptively prejudicial].)

[6]We reject at the outset defendant's assertion that the San Diego County District Attorney's office deliberately delayed the prosecution of defendant's case in order to gain a tactical advantage. (See *Doggett* v. *United States* (1992) 505 U.S. 647, 656 [112 S.Ct. 2686, 2693, 120 L.Ed.2d 520]; *Robinson* v. *Whitley* (5th Cir. 1993) 2 F.3d 562, 570 ["[I]f the defendant can show that the government intentionally held back its prosecution in order to gain an impermissible tactical advantage, then the defendant would 'present an overwhelming case for dismissal.' "].) In the moving papers he filed in the trial court, defendant made no allegation that the district attorney intentionally delayed prosecution for tactical reasons, and he offered no evidence that such was the case at the hearing on his motion to dismiss.

[7]We granted review in *People* v. *Martinez* (Nov. 25, 1997, S064558) to consider, inter alia, the question whether a felony complaint triggers the federal speedy trial right. (See *People* v. *Hannon* (1977) 19 Cal.3d 588, 605-606 [138 Cal.Rptr. 885, 564 P.2d 1203] [concluding that filing of a felony complaint is "by itself insufficient to trigger the protection of the right to a speedy trial under the federal Constitution"].)

 Article I, section 15 of the California Constitution provides, in relevant part, that "[t]he defendant in a criminal cause has the right to a speedy . . . trial . . . ." The filing of a felony complaint triggers the state speedy trial right. (*People* v. *Hannon, supra,* 19 Cal.3d at p. 608.) Under state constitutional analysis, "[t]he prejudicial effect of the delay on [a defendant] must be weighed against any justification for the delay." (*Jones* v. *Superior Court* (1970) 3 Cal.3d 734, 740 [91 Cal.Rptr. 578, 478 P.2d 10].) A defendant must first show that the delay caused actual prejudice, after which the burden shifts to the prosecution to justify the delay. If justification is shown, the court weighs the justification against the actual prejudice suffered by the defendant. (*Serna* v. *Superior Court* (1985) 40 Cal.3d 239, 249 [219 Cal.Rptr. 420, 707 P.2d 793].)[8]

 As to the federal constitutional claim, before defendant may allege a violation of his speedy trial right, he must establish the right attaches. Two preliminary questions arise. First, can he allege a federal speedy trial violation on the murder charge when the complaint filed two years before his arraignment accused him only of burglary? Second, is a felony complaint the functional equivalent of an "indictment or information" for federal speedy trial purposes? If the answer to either question is no, then he may not allege a violation of his federal constitutional right to a speedy trial. We need not resolve these questions here, however, because, even assuming that the right is applicable, defendant fails to show prejudice.

Defendant contends that the nearly two-year delay between the issuance of the initial complaint and his arraignment was presumptively prejudicial and that the length of the delay should be the controlling consideration. The People point to efforts during the period to secure defendant's arrival in California; they also argue that after the arraignment and preliminary hearing, defendant sought, and received, several continuances of the trial date. In any event, we conclude that the delay at issue, although considerable, was not so extensive as to establish presumptive prejudice resulting in a constitutional violation.

Defendant, who was, during the interval in question, already incarcerated for an unrelated offense, does not argue that he suffered oppressive pretrial incarceration. Nor does he establish that his defense was impaired by the delay. He argues that, absent the delay, he would likely have obtained counsel earlier and that such counsel would likely have made discovery motions to obtain access to the doorjamb; in addition he refers generally to unspecified missing documents and fading memories of unspecified witnesses. The prejudice he alleges is largely speculative; moreover, to the large

---

[8]We also granted review in *People* v. *Martinez* (Nov. 25, 1997, S064558) to consider whether to apply, instead, the federal test on this point.

extent it depends on the likelihood that he would have obtained discovery of the doorjamb before it disappeared, the claim is unavailing—as discussed, the doorjamb did not possess apparent exculpatory value at the time of its loss.

As to the state constitutional claim, similarly, even assuming that filing of a felony complaint triggers the speedy trial right and that we should continue to apply the analysis under *Serna* v. *Superior Court, supra*, 40 Cal.3d at page 249, defendant's claim fails. The justification offered by the prosecution for the delay clearly outweighs the merely speculative prejudice asserted by defendant.

### E. *Griffin Error*

Defendant sought to elicit testimony from Frank Orozco, his half brother, that he had planned to return to Santa Fe before Yvonne Weden was killed. The People objected to the testimony on hearsay grounds; the superior court ruled it admissible to show defendant's state of mind. The prosecutor argued: "The declarant is not unavailable, your honor," to which the superior court responded, "He is not unavailable at this juncture." Later, outside the presence of the jury, defendant moved for a mistrial, claiming that the prosecutor's comment was a "flag to the jury that the defendant was not testifying in the case and he was available to testify." The superior court denied the motion, explaining that it "took the objection as a legal objection, just as though it were a statement, hearsay, and an adjunct to that, and not as a comment to the jury." Defendant requested the superior court to "consider" admonishing the jurors that he had the right not to testify. The superior court observed that it had previously so instructed "almost ad nauseam" during voir dire, and stated that it would "of course" so instruct the jury again at the end of the case. At the conclusion of both the guilt and penalty phases, it gave an instruction to the effect that defendant had a right not to testify and no adverse inferences should be drawn from his failure to do so.

Defendant claims that the prosecutor committed error under *Griffin* v. *California* (1965) 380 U.S. 609 [85 S.Ct. 1229, 14 L.Ed.2d 106]. The point lacks merit.

*Griffin* holds that the privilege against self-incrimination of the Fifth Amendment prohibits any comment by the prosecution on a defendant's failure to testify at trial that invites or allows the jury to infer guilt therefrom. (380 U.S. at pp. 611-615 [85 S.Ct. at pp. 1231-1233].) We apply a "reasonable likelihood" standard for reviewing prosecutorial remarks, inquiring whether there is a reasonable likelihood that the jurors misconstrued or misapplied the words in question.

No error appears. Considered in context, there is no reasonable likelihood that the prosecutor's hearsay objection concerning Frank Orozco's testimony about defendant's desire to return to Santa Fe could have led jurors to misconstrue the objection as a reference to defendant's failure to testify. The comment was in the form of a legal objection, not a remark directed to the jury; it was not reasonably likely that jurors were misled into believing otherwise or that it would have increased the jury's inclination to treat the defendant's silence as an indication of his guilt.[9]

## F. *Admissibility of Tape Recordings*

The People sought to introduce two tape recordings of statements by Paul Weden made on June 10, 1989, shortly after he discovered his wife's body. The first was the recording of a 911 emergency call; the second was the recording of an interview conducted by Officer Victor Ray, the first police officer to appear at the scene. In the 911 recording, he reports to various dispatchers that it looks like his wife has been murdered; Paul says she is covered with blood and not breathing and asks them to "[p]lease hurry." In the interview with Officer Ray, he describes finding his wife lying in the hallway, dead, and explains when and how he entered the house.

Defendant objected to admission of the 911 recording on hearsay and relevance grounds. The prosecutor argued that it had probative value because it described the scene as Paul Weden originally found it and would also demonstrate that he was not involved in the murder, thus countering a defense raised on that basis. Defense counsel indicated that she might raise such a defense. The superior court admitted the evidence as falling within the spontaneous utterance exception to the hearsay rule: "[T]his would appear to be a spontaneous type of report that any person might make on discovering a crime." It ruled that the recording was relevant: "It's not bullet proof in the sense that no person who [was] somehow possibly involved in the crime would never make the report; but nonetheless, it's being offered, as I understand it, not so much for the truth of the matter stated, because the fact of death is going to be established by other evidence, but to essentially set the stage for the homicide investigation." It also ruled that the probative value of the recording outweighed any prejudicial effect: "As I read the transcript here, it—it doesn't accuse anybody of this. It doesn't even point the finger at the defendant. It simply is the report of the finding of the body, and where it was found. So its probative value, I find, is greater than any prejudicial or possible prejudicial effect."

---

[9]Defendant also asserts that the prosecutor's comment violated the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution. The claims, which derive from the claim of *Griffin* error, are similarly without merit.

Defendant also objected to admission of the tape of the police interview on the ground that its prejudicial effect outweighed its probative value. The superior court ruled that it, too, qualified as a spontaneous statement and that "there is some relevancy here on the condition of the scene."

 Defendant claims that the superior court erred in admitting what he characterizes as hearsay, irrelevant, and unduly inflammatory evidence. He is unpersuasive.

 Evidence Code section 1240 provides, in pertinent part, that evidence is "not made inadmissible by the hearsay rule" if it "[p]urports to narrate, describe, or explain an act, condition, or event perceived by the declarant" (*id.*, subd. (a)), and it was "made spontaneously while the declarant was under the stress of excitement caused by such perception." (*id.*, subd. (b).) "The crucial element in determining whether a declaration is sufficiently reliable to be admissible under this exception to the hearsay rule is . . . not the nature of the statement but the mental state of the speaker. The nature of the utterance—how long it was made after the startling incident and whether the speaker blurted it out, for example—may be important, but solely as an indicator of the mental state of the declarant. . . . [U]ltimately each fact pattern must be considered on its own merits, and the trial court is vested with reasonable discretion in the matter." (*People* v. *Farmer*, *supra*, 47 Cal.3d at pp. 903-904 [holding that trial court did not err in admitting 911 tape].)

Evidence Code section 352 "provides in part that the court may in its discretion exclude evidence 'if its probative value is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice.' " (*People* v. *Farmer*, *supra*, 47 Cal.3d at p. 906.)

 The superior court did not err in ruling that the recordings were admissible as spontaneous utterances. The statements in the tapes clearly purport to describe a condition perceived by the declarant. Moreover, as defendant acknowledges, the 911 recording was made "within minutes" of Paul Weden's arrival at his home, and the interview with Officer Ray was made "on the heels of the 911 call." The transcript of the recordings reveals that although Paul Weden responded to several questions posed to him by dispatchers and Officer Ray, his statements, in the immediate aftermath of finding his wife's body, could reasonably have been taken to represent his spontaneous reactions to the discovery.

The superior court's ruling that the tapes were admissible under Evidence Code section 352 did not constitute an abuse of discretion. The tapes were

relevant to show Paul Weden's initial reaction to the discovery of his wife's body and dispel any suggestion that he was involved in the murder; they also described the scene of the crime. Although the tapes reveal that Weden was upset—the dispatcher in the 911 call asked him to "calm down just a moment"—the statement on the tapes were descriptive and not highly inflammatory; the superior court not unreasonably concluded that they were more probative than prejudicial.[10]

## G. *Instruction on Flight*

The superior court instructed the jury as follows: "The flight of a person immediately after the commission of a crime is not sufficient in itself to establish his guilt, but is a fact which, if proved, may be considered by you in the light of all other proved facts in deciding the question of his guilt or innocence. If there was such a flight, the weight which such circumstance is entitled is a matter for the jury to determine." In so instructing, it rejected defendant's objection that his travel to Santa Fe was not flight because "he had intended long since to go to his mother's house."

Defendant claims that the superior court erred. He contends that the instruction was improper because there was no evidence of flight and his visit to Santa Fe did not warrant an inference of guilt. The point is without merit.

In general, an instruction advising the jury that evidence of flight alone is insufficient to establish guilt but may be considered with other proven facts in determining guilt "is proper where the evidence shows that the defendant departed the crime scene under circumstances suggesting that his movement was motivated by a consciousness of guilt." (*People* v. *Ray* (1996) 13 Cal.4th 313, 345 [52 Cal.Rptr.2d 296, 914 P.2d 846].)

Here, the evidence showed that defendant left Oceanside for New Mexico within hours after Yvonne Weden was killed. Although he had previously indicated that he wanted to return to New Mexico, he made no specific plans to do so before the date of the murder. He left suddenly on June 10 for New Mexico, surprising his mother with a call on June 11 shortly before arriving at her house. A reasonable juror could conclude from this evidence that his return to New Mexico constituted flight from Oceanside. A reasonable juror

---

[10]In addition, defendant asserts that the error violated the Fifth and Fourteenth Amendments to the United States Constitution. The point fails in the absence of any predicate error.

who so concluded could also reasonably consider the flight as supporting an inference of guilt.[11]

### III. Penalty Issues

#### A. *Death-qualification Voir Dire*

During voir dire, the superior court granted the prosecution's challenge for cause with regard to prospective juror Cynthia Steele, on the ground that she "clearly stated that her religious convictions prevent her from voting for the death penalty." Juror Steele indicated in a written questionnaire that the death penalty was against her religious beliefs. In response to the question, "In what types of cases/offenses do you feel the death penalty should be imposed?," she wrote: "In some of these case[s], when a person kill 5 or 7 people, but really can't say because it really isn't right to take another person['s] life." In voir dire, she gave consistent answers. When asked by the superior court: "Would your religious conviction prevent you from voting for a death penalty in this case knowing what you know about the legal procedures here? Would you be precluded, would you absolutely not vote for the death penalty because of your religious convictions," she responded: "Yeah, I wouldn't vote for that. I wouldn't—I—I would for guilty, but I—I wouldn't feel right. Because like I say, I'd be taking another person's life and I wouldn't feel right." Asked to give a "yes" or "no" answer to the same question, she said: "Yes." When asked, at the request of defense counsel, whether she had "some situation in mind where you think the death penalty might be appropriate," she answered: "Yes. Yes, like that case of that—that guy kills people, I can't think of his name, and he cut them up and ate parts of their body. . . . I'm not crazy about the death penalty but that was really bad." When the superior court repeated the question whether she would be unable to vote for the death penalty in this case, however, she again answered in the affirmative. The superior court denied a request by defense counsel to ask her whether she would "have an open mind" with respect to considering the death penalty "if in this case it were proven the defendant intentionally killed a 65-year-old woman in the course of a burglary of her house."

■■■ Defendant claims that the superior court erred in excusing prospective juror Steele for cause. He contends that the record supports only a conclusion that she had some religious scruples about the death penalty, not blanket opposition thereto. He argues that her answer to the superior court's

---

[11]Defendant also asserts violations of his rights under the Fifth and Fourteenth Amendments to the United States Constitution. The claims, based as they are on the court's supposed prejudicial error in giving the flight instruction, are without merit.

question regarding whether she would vote for the death penalty in this case did not support a challenge for cause. The point fails.

The question on review of this claim is whether exclusion was warranted because the juror's views concerning capital punishment would " 'prevent or substantially impair the performance of his duties as a juror . . . .' " (*Wainwright* v. *Witt* (1985) 469 U.S. 412, 424 [105 S.Ct. 844, 852, 83 L.Ed.2d 841]; accord, *People* v. *Samayoa* (1997) 15 Cal.4th 795, 822 [64 Cal.Rptr.2d 400, 938 P.2d 2].) "When a juror's views are conflicting or ambiguous, the trial court's determination as to his or her state of mind generally is binding on a reviewing court. When there is no inconsistency, but simply a question whether the juror's responses demonstrated a bias for or against the death penalty, the trial court's judgment will not be set aside if supported by substantial evidence." (*People* v. *Samayoa, supra,* 15 Cal.4th at p. 822.) Questions directed to a juror's attitudes toward the particular facts of the case are not relevant to the death-qualification process; however, " 'a court may properly excuse a prospective juror who would automatically vote against the death penalty in the case before him, regardless of his willingness to consider the death penalty in other cases.' " (*People* v. *Pinholster* (1992) 1 Cal.4th 865, 917-918 [4 Cal.Rptr.2d 765, 824 P.2d 571].)

The record supports the superior court's determination that prospective juror Steele harbored views unfavorable toward the death penalty that would substantially have impaired her ability to sit as a juror. She repeatedly stated that she would not vote for the death penalty "in this case," i.e., a case involving a single victim. She explained that she might do so, albeit reluctantly, only in an extreme case, such as, for example, one involving multiple victims and cannibalism. The questioning by the superior court properly elicited her views about the death penalty in the abstract; the particular facts of the case were not presented to her. Indeed, the superior court refused to permit defendant to also ask about her views regarding the specific case, i.e., whether she would have an "open mind" with respect to considering the death penalty for a person who killed a 65-year-old woman in the course of a residential burglary.[12]

### B. *Reference to Biblical Law*

Toward the end of closing argument, the prosecutor referred to the Penal Code and then continued: "There is another book, written long ago, that mentions the crime of murder, and mentions what is the appropriate

[12]Defendant raises additional claims under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and article I, sections 15, 16, and 17 of the California Constitution. They are unavailing in the absence of error.

penalty for the crime of murder, and that book says a couple of different things. It says, 'Thou shalt not steal.' It says, 'Thou shalt not kill.' It says 'And if he smite with an instrument of iron so that he die, he is a murderer. The murderer shall surely be put to death.' [¶] It says, moreover, 'Ye shall take no satisfaction for the life of a murderer which is guilty of death, but shall be surely put to death.' " Defendant did not object.

Defendant contends that the prosecutor's reference to biblical law constituted prejudicial misconduct. Although he concedes that his counsel failed to object, he contends that the prosecutor's argument was so egregious that a timely objection resulting in an admonition by the superior court would, in any event, have been ineffective to cure the harm. The claim fails.

As a threshold matter, because he did not object to the prosecutor's remarks, defendant failed to preserve the claim of prosecutorial misconduct for review. (*People* v. *Wash* (1993) 6 Cal.4th 215, 259-260 [24 Cal.Rptr.2d 421, 861 P.2d 1107].) But the claim also fails on its merits, in the absence of prejudice. ·

■ It is well settled that biblical law has no proper role in the sentencing process. "Penalty determinations are to be based on the evidence presented by the parties and the legal instructions given by the court. Reference by either party to religious doctrine, commandments or biblical passages tending to undermine that principle is improper. . . . What is objectionable is reliance on religious authority as supporting or opposing the death penalty. The penalty determination is to be made by reliance on the legal instructions given by the court, not by recourse to extraneous authority." (*People* v. *Sandoval* (1992) 4 Cal.4th 155, 194 [14 Cal.Rptr.2d 342, 841 P.2d 862].) " 'Argument of this sort by a representative of the government offends California statutes and judicial decisions, which establish the positive, secular law of this state as the rule governing the choice between life and death. [Citation.] It also violates the United States and California Constitutions . . . .' " (*Id.* at p. 200 (conc. and dis. opn. of Mosk, J.).)

■ As a general matter, reversal for error under California law requires prejudice, and prejudice, in turn, requires a reasonable possibility of an effect on the outcome when, as here, penalty in a capital trial is involved. (*People* v. *Gordon* (1990) 50 Cal.3d 1223, 1253 [270 Cal.Rptr. 451, 792 P.2d 251]; *People* v. *Brown* (1988) 46 Cal.3d 432, 446-448 [250 Cal.Rptr. 604, 758 P.2d 1135].) Similarly, it is the general rule for error under the United States Constitution that reversal requires prejudice and prejudice, in turn, is presumed unless the government shows that the defect was harmless beyond a reasonable doubt. (See, e.g., *Rose* v. *Clark* (1986) 478 U.S. 570, 576-579 [106 S.Ct. 3101, 3105-3107, 92 L.Ed.2d 460].)

The prosecutor's reference to biblical authority was clear misconduct. There could be no purpose for this portion of the argument other than to invite the jury to find support for a death verdict in the religious text.

Although we condemn the prosecutor's biblical references as misconduct, we also conclude that the misconduct was not prejudicial under the circumstances of this case. The prosecution's argument focused primarily, and at great length, on the brutal circumstances of the crime. He argued that although the jurors, under penalty factor (k) of Penal Code section 190.3, could be asked to show sympathy and mercy in fixing the punishment, defendant had shown no sympathy or mercy for Yvonne Weden. His brief allusions to biblical law amounted to little more than commonplaces, to emphasize his point that the jurors should instead judge defendant primarily by his acts. In context, the remarks could not have diminished a reasonable juror's sense of responsibility or displaced the superior court's instructions concerning the application of the Penal Code.[13]

## C. *Instruction on Weight of Aggravating Factors*

After listing the penalty factors of Penal Code section 190.3 for the jurors, the superior court instructed: "These various factors in aggravation and mitigation may be assigned different weights by you. Thus, it is not the number of factors necessarily, but also the weight you assign to them which should control. For instance, you could find that one specific factor on one side weighs so heavily in your consideration that it outweighs all of the determined factors on the other side. . . . Any aggravating factor, standing alone, may be sufficient to support a decision that death is the appropriate punishment. [¶] If a mitigating circumstance or aspect of the defendant's background or character arouses sympathy and compassion in you, you may consider that a circumstance in mitigation and impose life in prison without possibility of parole instead of the death sentence. [¶] Any mitigating factor standing alone may be sufficient to support a decision that life without possibility of parole is the appropriate punishment."

Defendant claims the superior court erred. He argues that the instruction was inconsistent with Penal Code section 190.3, which requires jurors to consider the aggravating and mitigating circumstances and to impose a sentence of death if it concludes that the aggravating circumstances outweigh the mitigating circumstances. He concedes that a juror could properly decide that one aggravating factor outweighed everything else and

---

[13]Defendant also argues that his trial counsel's failure to object to the prosecutor's remarks violated his right to effective assistance of counsel. He cannot make such a showing; there was no prejudicial prosecutorial misconduct.

warranted a sentence of death. He contends, however, that the superior court's instruction was misleading because it referred to any aggravating factor "standing alone." He insists that the phrase "standing alone" means "by itself, without reference to anything else," and that jurors were thus instructed that they could altogether ignore mitigating evidence. He is unpersuasive.

There was no reasonable likelihood that the jurors could have so understood the instruction. It did not, as defendant asserts, authorize jurors to disregard all mitigating evidence and consider any single penalty factor in isolation, i.e., without reference to anything else, in determining penalty. On the contrary, the superior court referred to each of the statutory factors in mitigation as well as in aggravation, and specifically instructed jurors that they could consider all the circumstances, including any sympathetic aspect of defendant's character or background as a mitigating factor. It also expressly instructed jurors to weigh all of the relevant factors in determining the appropriate punishment, while making it clear that the weighing process should not consist of a merely mechanical process of comparing the number of aggravating and mitigating factors. In this context, the phrase "standing alone" did not suggest that jurors could refuse to consider mitigating evidence.[14]

### D. Instruction on Witness's False Testimony

The superior court gave an instruction to the effect that it could reject "the whole testimony of a witness" who had willfully given false testimony on a material point, unless "the probability of truth favors his testimony in other particulars." Defendant contends that it was error to so instruct at the penalty phase. He argues that, because of the subjective, nonfactual nature of the penalty decision, such instruction interferes with the jurors' proper consideration of mitigating evidence. As he concedes, we considered, and rejected, the identical claim in *People* v. *Johnson* (1993) 6 Cal.4th 1, 48 [23 Cal.Rptr.2d 593, 859 P.2d 673]. We discern no reason to reconsider our holding therein.

### E. Instruction on Extreme Mental or Emotional Disturbance

The superior court gave an instruction regarding penalty factor (d) of Penal Code section 190.3: "Whether or not the offense was committed while the defendant was under the influence of extreme mental or emotional

---

[14]Because defendant fails to establish that the superior court erred, his additional claims under the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution, which are predicated on such alleged error, also fail.

disturbance." At defendant's request, it also instructed as follows: "I've used the phrase 'mental or emotional disturbance.' The phrase 'mental or emotional disturbance' includes fetal alcohol syndrome, prolonged drug and alcohol abuse and dependence, and personality disorders."

During deliberations, the jurors informed the superior court that they appeared to be deadlocked; at that time, the superior court again instructed regarding Penal Code section 190.3, penalty factor (d): "Now (d), whether or not the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance. There's been evidence that the defendant suffered either some mental or emotional disturbance. Whether it was extreme is up to you to determine, whether you believe that he was disturbed is up to you to determine, what weight you give that factor is up to you to determine." It also instructed regarding penalty factor (k): "The (k) factor, the last factor, which might be called the mitigating circumstance factor, although all of these other matters may have mitigating parts to them, the (k) factor, I'll just call that the mitigating factor, it's just an easy handle, entitles you to consider anything about the defendant, his background, his upbringing, any sympathetic factor and so forth." It specifically instructed the jurors that they could consider evidence concerning defendant's mental condition, "what the nature of the condition was, if any, whether it was schizoid or antisocial or a combination thereof, of whatever, these are factors you can consider."

Defendant contends the superior court erred: by so defining "mental or emotional disturbance," it led the jurors to understand that they could consider defendant's specific mental or emotional disorders in mitigation only if "extreme." The point is lacking in merit.

As defendant acknowledges, we have repeatedly rejected challenges to the use of the word "extreme" in Penal Code section 190.3, sentencing factor (d). (See, e.g., *People v. Ray, supra,* 13 Cal.4th 313, 359; *People v. Ghent* (1987) 43 Cal.3d 739, 776 [239 Cal.Rptr. 82, 739 P.2d 1250].) As we explained in *Ghent,* the statutory sentencing factor permitting consideration by the penalty jury of " '*any* other circumstance which extenuates the gravity of the crime' " is "sufficient to permit the penalty jury to take into account a mental condition of the defendant which, though perhaps not deemed 'extreme,' nonetheless mitigates the seriousness of the offense." (*People v. Ghent, supra,* 43 Cal.3d at p. 776, italics in original.)

Defendant argues that because of the additional reference to the specific forms of defendant's particular mental and personality disorder, jurors would have understood that Penal Code section 190.3, penalty factor (k) refers only

to mental evidence that is extreme. He is unpersuasive. The superior court instructed the jurors that they could consider, under penalty factor (k), "*anything* about the defendant, his background, his upbringing, any sympathetic factor . . . ." They would have understood from the instruction that they could consider in mitigation any evidence of defendant's fetal alcohol syndrome, alcohol and drug abuse, and personality disorders, even if not "extreme."[15]

### F. Refusal to Give Requested Instruction on the Meaning of Life Imprisonment Without Possibility of Parole

■ Defendant requested the following instruction: "Life in prison without possibility of parole means the defendant will [not ever] have a parole hearing. He will never be released on parole. Therefore, you must assume in determining penalty in this case defendant will not be released from prison ever." The superior court refused to give the instruction, citing our decision in *People* v. *Ashmus* (1991) 54 Cal.3d 932 [2 Cal.Rptr.2d 112, 820 P.2d 214] to the effect that such an instruction is ambiguous and misleading.

Defendant asserts that the court erred. He argues that the instruction only requires the jurors to "assume" that he would not be released from prison; it does not falsely state that he will never, in fact, be released. The claim is lacking in merit.

In *Ashmus*, the superior court refused to instruct the jury as follows: " 'A sentence of life without the possibility of parole means that the defendant will remain in state prison for the rest of his life and will not be paroled at any time.' " (54 Cal.3d at p. 994.) We held that the superior court did not err. "A court may not give an instruction that is incorrect. [Citation.] And it is incorrect to declare that the sentence of life imprisonment without possibility of parole will inexorably be carried out. [Citation.] The instruction here would effectively have made just such a declaration." (*Ibid.*)

Like the instruction in *Ashmus*, the proposed instruction was incorrect to the extent it suggested that someone who is never given a parole hearing or released on parole will, therefore, never be pardoned or have his sentence commuted. Use of the word "assume" does not cure the problem with the

---

[15]Defendant asserts that the error violated his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and article I, sections 15, 16, and 17 of the California Constitution. For the reasons stated, there was no error. In the absence of error, the claim of ineffective assistance of counsel also fails.

instruction. Like the instruction in *Ashmus*, it could reasonably be understood to have "stated all but expressly that the penalty would inexorably be carried out." (*People* v. *Ashmus, supra,* 54 Cal.3d at p. 994.)[16]

### G. *Failure to Inform Jury That It Could Refuse to Impose the Death Penalty in the Absence of Any Mitigating Evidence*

■ The superior court gave the standard instructions concerning selection of the appropriate punishment, admonishing the jury, inter alia, as follows: "In weighing the various circumstances, you determine under the relevant evidence which penalty is justified and appropriate by considering the totality of the aggravating circumstances with the totality of the mitigating circumstances. [¶] To return a judgment of death, each of you must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it [*sic*] warrants death instead of life without parole."

Defendant asserts that the superior court erred in failing also to inform the jurors that they had discretion to refuse to impose the death penalty even if they found that there was no evidence in mitigation. He insists that lack of such instruction violated his rights under the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution. The claim fails. No such instruction was required.

We rejected the same point in *People* v. *Ray, supra,* 13 Cal.4th at page 355. As in *Ray,* "the standard instructions given in this case adequately guide selection of the appropriate punishment, including the jury's discretion to reject a death sentence under the circumstances highlighted by defendant. Specifically [the jury was informed] that in order '[t]o return a judgment of death, each of you must be persuaded that the aggravating [evidence is] so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole.' By stating that death *can* be imposed only in one circumstance—where aggravation substantially outweighs mitigation—the instruction clearly implies that a sentence less than death *may* be imposed in all other circumstances." (*Id.* at pp. 355-356, italics in original.)

[16]Defendant also suggests that the instruction was proper because a juror might reasonably have understood the admonition to "assume" that the sentence would be carried out to imply that it might, in fact, *not* be carried out. If so, the instruction would be incorrect for the same reason that it is error to instruct a jury about the Governor's powers of reprieve, pardon, and commutation. (*People* v. *Warren* (1988) 45 Cal.3d 471, 489 [247 Cal.Rptr. 172, 754 P.2d 218] [so-called Briggs Instruction concerning the Governor's powers unconstitutionally invites the jury to be influenced by speculative and improper considerations.].) Defendant asserts that the instructional error also violated his rights under the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution. The claims are unavailing; the provisions are not implicated.

We therefore conclude, as before, that the superior court's instructions concerning its sentencing discretion adequately advised the jury of its sentencing responsibilities. " 'No reasonable juror would assume he or she was required to impose death despite insubstantial aggravating circumstances, merely because no mitigating circumstances were found to exist.' " (*People v. Ray, supra,* 13 Cal.4th at p. 356.)

### H. *Instructions Regarding Evidence of Defendant's Criminal Activity*

The parties stipulated that six of defendant's prior felonies were true. The superior court instructed jurors as follows: "Neither the defendant's juvenile criminal history nor any violation of probation incurred by him may be considered or treated by you in aggravation. [¶] Evidence received in the guilt or innocence phase relating to defendant's drug use or possession or related activities . . . as well as what may have been produced in the penalty phase or any other uncharged crime or crimes is or are not an aggravating factor and cannot be considered by you for any purpose in aggravation." It then listed defendant's six prior felony convictions, and continued its instruction as follows: "These prior felony offenses have been stipulated to by both the prosecution and the defendant. You may consider such crimes as aggravating circumstances in this case. [¶] These convictions—the conviction of these crimes must be proved beyond a reasonable doubt. [¶] You may not consider any evidence of any other crime as an aggravating circumstance unless such other crime has been proven beyond a reasonable doubt." After defining "reasonable doubt," the superior court continued: "Also, evidence has been introduced for the purpose of showing that the defendant . . . has committed the following criminal acts, which involve, or allegedly involve the expressed or implied use of force or violence or the threat of force or violence." After listing four violent criminal acts allegedly committed by defendant, it instructed that before a juror could consider any of the acts as an aggravating circumstance, he or she must first be satisfied beyond a reasonable doubt that defendant committed the act. It then instructed: "A juror may not consider any evidence of any other criminal acts as an aggravating circumstance." Later in the instructions, it reiterated: ". . . I've indicated to you that certain activity, that is, the prior felony convictions and the prior acts involving threats of violence or violence, must be proved beyond a reasonable doubt."

Defendant contends that the superior court erred by giving contradictory and incorrect instructions. He argues that by instructing the jurors that they may not consider any evidence of "any other crime" unless it was proven "beyond a reasonable doubt" it improperly permitted them to consider nonstatutory aggravating circumstances, in violation of his rights under

the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution. He is unpersuasive.

Evidence of nonviolent crimes, except for felony convictions, may not be considered at the penalty phase. (*People* v. *Boyd* (1985) 38 Cal.3d 762, 774 [215 Cal.Rptr. 1, 700 P.2d 782].) The instructions at issue did not authorize the jurors to act inconsistently with that requirement. Taken as a whole, the instructions were neither contradictory nor incorrect. In context, the jurors would reasonably have understood that they could consider in aggravation only the felonies stipulated to by defendant and the prosecution, and criminal acts referred to by the superior court, and then, only if those six felonies and four criminal acts were proven beyond a reasonable doubt. There is no reasonable likelihood that the jurors would have understood that they could consider any other crimes or criminal activity in aggravation.

I. *Refusal to Instruct That Evidence of Prior Felonies and Violent Criminal Acts Could Be Considered in Mitigation*

Defendant requested instructions to the effect that evidence of prior felonies and prior violent criminal acts could be considered as circumstances in mitigation. Defense counsel argued: "We think the jury ought to be able to consider those crimes as a manifestation, a reflection of the poverty and deprivation of Rudolph Roybal's childhood, and in that sense, can treat them as mitigation, not aggravation. It can also consider the nature of the crimes, property crimes, and consider that as mitigation . . . ." "We think the jury can consider these prior so-called acts of violence as circumstances in mitigation, and again, we object that the jury being told, if not entirely explicitly, these are circumstances that can serve only to aggravate." The superior court denied the request on the ground that such instruction would be confusing.

Instead, the superior court instructed the jurors, inter alia, that they could consider, under Penal Code section 190.3, penalty factor (k), "any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death, whether or not related to the offense for which he is on trial." It also instructed the jurors that they could consider "anything about the defendant, his background, his upbringing, any sympathetic factor and so forth." In addition, it instructed that they could consider whether "at the time of the offense the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirement of law was impaired as a result of mental disease or defect or the effects of intoxication." After the jurors indicated that they might be deadlocked, the court stated: ". . . I think the attorneys, for

example, one side, argued well, these are not—there were no weapons used in any of these offenses, they were done during a time when allegedly the defendant was inebriated or under the influence or something like that; well, that's a factor you can consider."

■ Defendant contends that the superior court erred in refusing his requested instruction, thereby violating his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and article I, sections 7, 15, 16, and 17 of the California Constitution. Specifically, he argues that by referring to "any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death," the superior court implied that the jurors could consider in mitigation only sympathetic evidence he offered, but could not regard any of the evidence the prosecution presented. He is unpersuasive. There is no reasonable likelihood that the superior court's instructions, considered as a whole, would have led a reasonable juror to believe he or she could not consider, in mitigation, *any* relevant evidence, including the fact that some of defendant's prior felonies were not violent, and that some of his prior violent criminal acts might have been committed under the influence of substance abuse or a mental disorder.

### J. *Refusal to Allow Defendant to Compare His Crime to Other Well-known Murders*

In closing argument, defense counsel sought to compare defendant's crime to the facts of other well-known murders—particularly the so-called "Billionaire Boys Club" case in which the defendant did not receive the death penalty. She argued that defendant's "organic impairment, emotional impairment, psychological impairment" distinguished him from other murderers: "Should you count that? Of course you should." She then referred to the Billionaire Boys Club, "privileged kids who don't have a problem in their background, except maybe they were spoiled, coldly calculating killing people for money." The superior court sustained an objection by the prosecutor and admonished the jurors that they were "not to consider comparison *with any other particular crime.*" During a supplemental charge to the jurors, it repeated the admonition: "[Y]ou may not attempt to compare this crime, this murder, with any other murder. In other words, you can't indulge in comparisons. If you did that, we—the attorneys would have no idea what you were comparing it with. There's no evidence before you as to what other crimes that you're to compare this with. . . . You focus on the facts associated with this case, with this defendant, with this crime."

■ Defendant claims error, in violation of his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. He argues that a juror may not be precluded from comparing the

circumstances of the crime to the facts of other cases and that defense counsel should have been permitted to argue that they should do so. No error appears.

The superior court's ruling fell within its discretion to control the scope of closing argument. (*People* v. *Sanders* (1995) 11 Cal.4th 475, 555 [46 Cal.Rptr.2d 751, 905 P.2d 420] ["The trial court did not err in excluding references to the notorious but unrelated crimes of Charles Manson or to the penalty of life imprisonment that he ultimately received."].) As we explained in our discussion in point in *People* v. *Marshall* (1996) 13 Cal.4th 799, 855 [55 Cal.Rptr.2d 347, 919 P.2d 1280], meaningful comparisons with other well-publicized crimes cannot be made solely on the basis of the circumstances of the crime or the social status of the perpetrator, without consideration of the other aggravating and mitigating circumstances. Yet the superior court could properly conclude that allowing counsel to argue all such circumstances would be too time-consuming and direct the jury's focus away from the matter at issue. Defendant was not precluded from arguing his central point: that the circumstances of the crime were mitigated by his background and his mental and emotional disorders.

■ The trial court's instruction to the jurors that they "may not attempt to compare this crime, this murder, with any other murder," also did not constitute prejudicial error. "The focus in a penalty phase trial of a capital case is on the character and record of the individual offender." (*People* v. *Johnson* (1989) 47 Cal.3d 1194, 1249 [255 Cal.Rptr. 569, 767 P.2d 1047].) The sentences received by notorious defendants in other cases, based on different facts and evidence not before the jurors, is of dubious relevance. The jurors were not instructed that they should not consider the defendant's central point, i.e., that his crime was mitigated by his personal background.

### K. *Instruction Regarding Jurors' Views Concerning the Death Penalty*

■ After the jurors informed the superior court during deliberations that they appeared to be deadlocked, it gave a supplemental instruction as follows: "All of you took an oath and told us under oath that you would not re-debate the issue of the death penalty. Well, that was a matter that you took care of, if you were interested, in the ballot box but not in the jury setting. [¶] Along the same lines, you cannot consider the religious, philosophical or political background, the differences you may have with regard to whether the death penalty is appropriate or inappropriate. [¶] Why? Once again, you wouldn't be true to your oath. You'd be misleading the attorneys, the parties here, because they're expecting, and they've had your pledge, that those matters would not enter into your thinking."

Defendant asserts error. He contends that the superior court's remarks violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. He argues that under those provisions a juror may not be prohibited from considering any conscientious scruples he or she may have about the death penalty in determining the appropriate punishment at the penalty phase. The claim is lacking in merit. The superior court did not err in reminding jurors of their oath to render a verdict according only to the evidence presented and the instructions of the judge, i.e., that they should set aside their moral, philosophical, or religious reservations about the death penalty in deference to the rule of law.

L. *Instruction That Jurors Could Not Place Themselves in the Shoes of the Victim or Defendant*

The superior court instructed: "Another thing you cannot do is place yourself in the shoes of the victim or of the defendant. Now, let me just—it's very common sense to me, but maybe I need to explain this. If you were to place yourself in the shoes of the victim or the shoes of the defendant in deciding this case, then you might just say, well, wait a second, if someone killed me, that guy is—deserves the death penalty. [¶] But that is not your job. Your job is a weighing process that I'll get to and I've already told you about. You can't do that. By the same token, if you place yourself in the shoes of the defendant, the death penalty would never, or at least arguably, would never, ever be imposed by a jury, because the jurors, or at least one of the twelve would at least say, hey, I wouldn't like to be killed. So that is not a factor that you can put into the equation, so to speak."

Defendant claims that the superior court erred. He argues that jurors may not be precluded from viewing mitigating evidence from the perspective of the defendant in order to determine whether death is the appropriate punishment.[17]

The claim fails. The superior court did not, as defendant suggests, prevent the jurors from considering mitigating evidence concerning defendant's background and character or even from sympathizing with him. Rather, its instruction directed the jurors not to substitute emotion for rational judgment. It did not err in instructing the jurors, in effect, that that they should

---

[17]As defendant correctly points out, we rejected a claim in *People* v. *Wash, supra,* 6 Cal.4th at pages 263-264, that it was misconduct for the prosecutor to invite the jurors to put themselves in the shoes of the victim. " '[W]e have found such an appeal appropriate at the penalty phase because there "the jury decides a question the resolution of which turns not only on the facts, but on the jury's moral assessment of those facts as they reflect on whether defendant should be put to death." ' " (*Id.* at p. 263.) Understandably, defendant does not assert a claim based on this portion of the superior court's instruction.

not allow considerations about how they would personally react if they faced a sentence of death to interfere with their consideration of the evidence.[18]

M. *Cumulative Error*

Defendant contends that the cumulative prejudice of prosecutorial misconduct and the superior court's errors at the guilt and penalty phases require reversal. We have concluded that none of defendant's claims was meritorious. Accordingly, we also reject his claim that cumulative error affected the process or result of the trial to his detriment.

### IV. DISPOSITION

For the reasons stated above, we affirm the judgment.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., Chin, J., and Brown, J., concurred.

Appellant's petition for a rehearing was denied January 13, 1999, and the opinion was modified to read as printed above.

---

[18]Defendant also asserts violation of his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, predicating the claims on the asserted state law error. Because we reject the state law claims, the federal claims also fail.