[No. B185861. Second Dist., Div. Seven. Mar. 6, 2006.]

THE PEOPLE, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
FERNANDO F. MALDONADO, Real Party in Interest.

354

**COUNSEL**

Steve Cooley, District Attorney, Brentford J. Ferreira and Tracey Lopez, Deputy District Attorneys, for Petitioner.

No appearance for Respondent.

Janice Y. Fukai, Alternate Public Defender, Michael Goodman and Ken Nakamura, Deputy Alternate Public Defenders, for Real Party In Interest.

OPINION

**JOHNSON, Acting P. J.**—Based on the particular facts of this case, we hold writ review is not available to the prosecution to challenge the trial court's denial of its motion for a *Kelly-Frye*[1] hearing on the admissibility of certain scientific evidence proposed by the defense. The trial court held a hearing on the issue whether a *Kelly-Frye* hearing was required, considered conflicting evidence on that issue, and ruled. At worst, the trial court erred in its evaluation of the evidence and therefore reached an erroneous decision. But this specie of error does not constitute an act "in excess of the court's jurisdiction" and thus is not one of those exceptional situations in which the prosecution is permitted writ review.

## FACTS AND PROCEEDINGS BELOW

In June 2003, Fernando F. Maldonado was charged with, among other offenses, forcible rape, oral copulation and sodomy while acting in concert with other perpetrators in a 101-count indictment based on crimes that allegedly occurred in February 1991. Early in 2004, Maldonado hired National Medical Services (NMS), a private laboratory, to test samples from oral, vaginal and rectal swabs as well as blood samples collected from the two victims in 1991. NMS tested these samples for the presence of cocaine and its metabolites. Apparently the defense sought to show the alleged victims had ingested cocaine at or around the time the sexual contact occurred. NMS reported all of the samples from the oral, vaginal and rectal swabs tested positive for cocaine and/or its metabolites. The blood samples all tested negative.

During pretrial discovery in this case, Maldonado turned over to the prosecution two letters (dated April 8 and August 16, 2004) from his expert witness, Marc Scott Taylor, regarding testing conducted on the oral swab sample from one of the alleged victims. Taylor opined the drugs detected in the sample (cocaine and its metabolites) "had to be in the system of the individual sampled and not the result of residual semen" deposited in the mouth of the victim by one of the alleged perpetrators. He based this opinion "on [his] training and experience in examining oral swabs in sexual assault cases and performing analysis for the presence of semen and DNA from components of semen." Taylor stated the "constant flow of saliva dilutes any semen in the mouth and quickly washes it away."

Maldonado also turned over to the prosecution a memorandum, dated April 8, 2004, prepared by Raymond C. Kelly, Ph.D., a forensic toxicologist who

---

[1] *People v. Kelly* (1976) 17 Cal.3d 24 [130 Cal.Rptr. 144, 549 P.2d 1240]; *Frye v. United States* (D.C.Cir. 1923) 54 App. D.C. 46 [293 F. 1013].

used to be the laboratory director at NMS. Kelly reviewed NMS lab reports on the tests at issue in this case. He stated, in pertinent part: "The toxicology report showed cocaine, cocaethylene, benzoylecgonine, or various combinations of the three being detected in several of the specimens. These positive findings would be consistent with an interpretation in which the donor of the samples had ingested cocaine within the prior 24 hours or so. They would also be consistent with an interpretation in which the drug substances were deposited by one or more of the alleged assailants in the case. [¶] According to the NMS report, neither cocaine nor metabolites were detected in specimens labeled 'blood.' Such negative findings in the blood samples does [*sic*] not rule out cocaine use on the part of the complainants because cocaine and its metabolites would not normally be stable in a sample stored for several years. Therefore, such findings do not necessarily mean that the samples did not contain cocaine or its metabolites at the time of collection."

In December 2004, the prosecution filed a motion asking the trial court to hold a *Kelly-Frye* hearing concerning the drug testing conducted by NMS and "any proposed defense expert testimony regarding the presence of any drugs or their metabolites in the bodies of either of the two victims in this case." "[U]nder the *Kelly-Frye* rule the proponent of evidence derived from a new scientific methodology must satisfy *three* prongs, by showing, first, that the reliability of the new technique has gained general acceptance in the relevant scientific community, second, that the expert testifying to that effect is qualified to do so, and third, that ' "correct scientific procedures were used in the particular case." ' "[2] The prosecution asserted Maldonado's proposed expert testimony was derived from a new scientific methodology and Maldonado could not satisfy any of the three prongs of the *Kelly-Frye* rule.

In its motion, the prosecution first attacked Taylor's opinion, "In cases with full oral ejaculation it is unusual to find sperm cells on an oral swab and very rare to find detectable levels of the fluid portion of the semen." The prosecution explained "[n]o studies or data have been presented to the People in support of Mr. Taylor's stated belief" and his exclusion of the possibility of "the victim's involuntary exposure to cocaine from [Maldonado] and his co-suspects in this case." The prosecution stated it was unaware "of any research relating to the metabolization of cocaine within vaginal, rectal or oral samples, or samples containing a mixture of seminal fluid within each of the aforementioned samples." The prosecution asserted: "For all we know, it may be that any cocaine or cocaine metabolites within any of the samples at the time they were extracted in February of 1991 would have totally dissipated (as in the case of blood) after one year. If that is so, a finding of cocaine and/or cocaine metabolites in samples, such as the samples in this case, which have been stored, handled and tested for DNA during a period of

---

[2] *People v. Roybal* (1998) 19 Cal.4th 481, 505 [79 Cal.Rptr.2d 487, 966 P.2d 521].

13 years before the finding of cocaine, would clearly be suspect and would point to an obvious case of contamination." The prosecution also noted Taylor is not a toxicologist and his resume does not reveal any training in toxicology.

The prosecution next attacked the procedures NMS used in testing the swab samples (and, consequently, Taylor's use of these testing results as a basis for his opinions). A toxicologist at NMS explained the lab had to alter its normal drug testing procedures when using samples from oral, vaginal and rectal swabs as opposed to blood samples taken from the victims: "Any deviations from our usual procedures in this case were to improve the sensitivity of the assay since low concentration of the analytes of interest were expected." The prosecution stated "these deviations included lowering the standard reporting limit for detecting cocaine" and "add[ing] a significant amount of solvent to the samples tested in this case" to "affect[] the concentration level of [the] substance." The prosecution asserted: "No scientific or validation studies, nor peer review documentation has been presented to the People to support the scientific reliability of the defense lab testing procedures as applied to the samples tested by the lab in this case nor to support any deviations from those procedures employed by the lab in testing these samples." NMS conceded it had no standard operating procedures relating to the oral, vaginal and rectal samples it tested. The prosecution argued "there is no general acceptance in the scientific community for the testing procedures utilized by NMS."

After the prosecution filed its motion for a *Kelly-Frye* hearing in December 2004, it continued to use the discovery process to seek further documents from Maldonado concerning the testing procedures NMS employed. In April 2005, Maldonado filed a "supplemental brief" concerning the prosecution's request for a *Kelly-Frye* hearing.[3] Maldonado argued the detection of cocaine and its metabolites using gas chromatography, mass spectrometry and immunoassay (the type of testing NMS conducted in this case) is a "well established area[] of science." Concerning the prosecution's challenge to Taylor's qualifications as an expert witness in this case, Maldonado explained: "Upon the urging of the [trial] Court, [defense] counsel hired a second expert, Yale H. Caplan, Ph.D., to further expand on the *Kelly-Frye* issue." At the time, Caplan was serving as president of the American Board of Forensic Toxicology, an agency with which NMS had very recently become accredited.

---

[3] To the extent Maldonado filed an earlier brief on this issue it is not in the record before this court. Maldonado does not contend there is any substantive information he presented to the trial court in support of his opposition to the prosecution's motion for a *Kelly-Frye* hearing which is not a part of the record in this writ proceeding.

Caplan reviewed "materials supplied by" NMS and also interviewed the laboratory director of NMS and the toxicologist at NMS "who certified the results in this case." In a four-page letter to Maldonado's counsel, dated April 8, 2005, Caplan stated: "The methods used include immunoassay (ELISA) and gas chromatography mass spectrometry (GCMS). GCMS is the combination of two methods, therefore, all substances identified as positive were identified by three separate procedures. All test specimens were subjected to the co-analysis with quality control specimens known to contain the drug of interest and blank specimens which do not contain the drug. A number of predesignated criteria must be met as noted in the standard operating procedure manual as a condition to be reported as positive. There is extensive documentation in the scientific literature for the use of these combined methods for the determination of cocaine and other substances. Further, these methods have been used by the U.S. Department of Health and Human Services and the U.S. Department of Transportation in the testing of approximately 5 million forensic workplace specimens each year (since 1988). The data provided by NMS utilizes these methods and all quality elements were demonstrated to be satisfactory. The qualitative identification of cocaine and other substances in the referenced case is certain."

Addressing the prosecution's concerns about NMS's lack of standard operating procedures for the swab samples tested, Caplan stated: "Forensic toxicology includes a variety of specimens, some that may be infrequently tested and require special consideration. Testing for drugs is generally accomplished by first separating the drug from the matrix (i.e., blood, urine, swab), then concentrating the separated (extracted) drug, and finally subjecting the extracted drug to the analytical procedure. This same process is followed whether the specimen is blood, urine, or a swab. The testing of swabs for cocaine is not a novel procedure. The swab is a specimen routinely collected in many death investigation cases. Depending of [sic] the test desired, the toxicologist can design and document a method based on the use of good laboratory practices. Many specimen types that are less frequently encountered can be tested using such modified methods. NMS conducted the testing of the referenced specimens using such an approach. This was done in accordance with their standard operating procedure entitled 'Handling of Clinical and Forensic Specimens [citation]' which sates 'if the initial preparation of a specimen is unique, but the extraction procedure and the rest of the analysis is as per the routine analysis for that analyte, then the protocol need only to describe the initial preparation and then be referred to the normal method for the rest of the procedure.' NMS followed its standard procedure in the conduct of the analysis of the swab specimens. The use of swabs is well documented in the scientific literature [citations]. In my 22 years at the

Maryland Medical Examiner's Office Toxicology Laboratory, I had conducted or supervised tests for cocaine and other drugs on at least 100 swabs annually."

In June 2005, the prosecution filed a response to Maldonado's supplemental brief. The prosecution asserted, although the gas chromatography/mass spectrometer "is a well-known testing device," Maldonado had not shown the use of this device and the use of NMS's altered protocol to test samples from oral, vaginal and rectal swabs is accepted within the scientific community. Although Caplan stated in his letter the "use of swabs is well documented in the scientific literature," he did not demonstrate that the use of samples from oral, vaginal and rectal swabs (let alone the specific protocol NMS used to test these samples) is documented in the scientific literature. The prosecution argued, "The defense produces no context in which the Court can determine a history of repeated use, study, testing or confirmation by scientists or trained technicians of all the procedures used by NMS in this case."

The prosecution submitted to the trial court a 19-page declaration from its expert witness Naresh C. Jain, a professor of pharmacology and toxicology at USC School of Medicine, the laboratory director of National Toxicology Laboratories, Inc., and a diplomate of the American Board of Forensic Toxicology. Jain reviewed, among other things, "the testing procedures performed by [NMS] on the samples in this case" and written opinions of Maldonado's experts (the letters described above). According to Jain, "in developing a reliable testing protocol, research needs to be conducted or existing research evaluated to determine whether cocaine when ingested will be excreted into the oral, anal, and vaginal cavities of the ingestor, whether that cocaine will be detectable within swabs that had been inserted into these cavities, and whether such cocaine and/or its metabolites will not degrade or disappear and still be detectable after almost 10 years of storage at room temperature." Jain added, "Although there are some studies researching the detection and concentration levels of cocaine within the saliva or within the seminal fluid of an individual following his or her ingestion of that drug, there are no studies of which I am aware that research the concentration levels of cocaine and/or its metabolites within seminal fluid mixed with the saliva of a second person or that research the concentration levels of cocaine and its metabolites within seminal fluid mixed with any other bodily fluids of another person."

Jain also attacked the specific testing procedures NMS used in this case. For example, Jain stated "proper laboratory methodology must be validated on similar specimens from known drug users before that methodology is implemented on evidence or forensic samples using immunoassay/GCMS testing. NMS has provided no data to support that their [sic] method was

validated based on previous testing of oral, rectal and vaginal swabs from known cocaine users." Jain also stated NMS deviated from its own standard operating procedure in setting a lower reporting limit for the detection of cocaine and its metabolites in these swab samples, but "provided no data to show that it can reliably and/or consistently detect cocaine at such a low quantity in these types of samples." Jain added, "At a low detection level, the laboratory would run into the risk of detecting negligible amounts of cocaine that could have resulted from accidental contamination and not from cocaine ingestion."

Jain also asserted: "One of the most glaring deficiencies in proper toxicological test procedures by NMS and its experts in this case is its performance of a confirmatory test involving the use of a GCMS machine when its own drug screening test using an immunoassay procedure (ELISA) was negative twice for all drugs screened within the evidence samples submitted in this case. Proper toxicology practice requires a laboratory first to use a screening test to determine the presence of a particular drug. If the screening test is negative, no further testing is performed and the result is reported as negative. If the screening test is positive, however, then further testing is done to confirm the presence of the drug and quantify the amount of that drug, if detected, within that sample. . . . [B]oth immunoassay (ELISA) tests by NMS reported negative drug results for the evidence samples. At this point, NMS should not have proceeded to perform a confirmatory test using the GCMS on these samples, as there was no positive drug result for such a test to 'confirm.' " Jain pointed out, given the negative immunoassay test results, Caplan's assertion the samples from the oral, vaginal and rectal swabs tested positive for cocaine and/or its metabolites in "three separate procedures" is false.

In July 2005, Maldonado filed a "sur rebuttal" concerning the prosecution's motion for a *Kelly-Frye* hearing. Maldonado argued GCMS "analysis of cocaine is accepted" and the fact there is a lack of specific written protocols concerning the detection of cocaine in oral, vaginal and rectal swab samples is immaterial to the admissibility of the proposed evidence relating to NMS's testing. Maldonado asserted (with no citation to any evidence or law) the fact "the samples were of an unusual nature is not grounds for a *Kelly* hearing."

On July 21, 2005, the trial court held a hearing on the prosecution's motion for a *Kelly-Frye* hearing. Before the parties gave their oral arguments, the court made the following comments: "[I]n going through all of these motions and so forth that have been filed in this case—and the issue basically is, it seems to me the use of—the kind of testing is not anything new and different that hasn't been accepted. [¶] I think the challenge basically is to what the results mean rather than is the testing valid in terms of if there is presence of

cocaine in this tested material. Does it mean it came from the victim? Does it mean it came from the defendant or from either one or from both? Or can you tell? [¶] I mean, it seems to me that's more the issue than the test itself. And so I don't see that we need a Kelly-Frye on the testing. [¶] And in terms of the results of what that—what the test means, it seems to me that if there was a disagreement among experts, that the jury would be free to hear and accept or reject the expert opinions from anybody that has sufficient background to present them. [¶] But I don't think this is a Kelly-Frye issue; I really don't." A lengthy oral argument by the prosecution did not change the trial court's tentative ruling and the court denied the prosecution's motion for a *Kelly-Frye* hearing.

The prosecution asked for a pretrial hearing concerning the foundation for any proposed expert witness testimony offered by the defense. The trial court ruled it would hold a section 402 hearing[4] outside the presence of the jury on issues related to the third prong of the *Kelly-Frye* analysis immediately before any defense expert witness was scheduled to testify as to these issues. The court stated, "a 402 hearing as to whether the particular machine was working, and procedure was followed, you can have." The court did not believe "prongs one and two [of the *Kelly-Frye* analysis] are applicable here."

The prosecution filed this petition for writ of mandate. We issued an order to show cause to review the trial court's ruling and Maldonado filed his return. We granted the prosecution's request to stay the trial of this matter pending our resolution of the petition.[5]

## DISCUSSION

Maldonado's primary challenge to the prosecution's petition for writ of mandate does not relate to the merits of the trial court's ruling on the prosecution's motion for a *Kelly-Frye* hearing. Instead he argues writ relief is not available to the prosecution in the situation presented here. After reviewing the appropriate criteria for allowing the People appellate review via a writ petition, we agree with Maldonado this case does not satisfy these criteria.

■ "The Legislature has determined that except under certain limited circumstances the People shall have no right of appeal in criminal cases."[6] These "limited circumstances" are set forth in Penal Code section 1238. In that

---

[4] Evidence Code section 402.

[5] Maldonado opposed the prosecution's request for a stay of trial on the ground the prosecution "has no right of appeal in this matter." He did not argue such a stay (or our issuance of a peremptory writ) would impinge upon his right to a speedy trial.

[6] *People v. Superior Court (Howard)* (1968) 69 Cal.2d 491, 497 [72 Cal.Rptr. 330, 446 P.2d 138].

section the Legislature sharply circumscribed the scope of appellate review, and as to pretrial rulings limited that review to a few which either, as a matter of law or for practical purposes, are likely to terminate the case without trial.[7] Neither as a matter of law nor as a practical matter would the decision before us on this writ, even if it ultimately resulted in the admission of this piece of defense evidence, prevent the prosecution from bringing this case to trial. At the worst, from the People's perspective, it will provide the defense with an argument to urge the defendant's innocence. The prosecution concedes it has no right to appeal the trial court's denial of its motion for a *Kelly-Frye* hearing under section 1238.

---

[7] Penal Code section 1238 provides:

"(a) An appeal may be taken by the people from any of the following:

"(1) An order setting aside all or any portion of the indictment, information, or complaint.

"(2) An order sustaining a demurrer to all or any portion of the indictment, accusation, or information.

"(3) An order granting a new trial.

"(4) An order arresting judgment.

"(5) An order made after judgment, affecting the substantial rights of the people.

"(6) An order modifying the verdict or finding by reducing the degree of the offense or the punishment imposed or modifying the offense to a lesser offense.

"(7) An order dismissing a case prior to trial made upon motion of the court pursuant to Section 1385 whenever such order is based upon an order granting the defendant's motion to return or suppress property or evidence made at a special hearing as provided in this code.

"(8) An order or judgment dismissing or otherwise terminating all or any portion of the action including such an order or judgment after a verdict or finding of guilty or an order or judgment entered before the defendant has been placed in jeopardy or where the defendant has waived jeopardy.

"(9) An order denying the motion of the people to reinstate the complaint or a portion thereof pursuant to Section 871.5.

"(10) The imposition of an unlawful sentence, whether or not the court suspends the execution of the sentence, except that portion of a sentence imposing a prison term which is based upon a court's choice that a term of imprisonment (A) be the upper, middle, or lower term, unless the term selected is not set forth in an applicable statute, or (B) be consecutive or concurrent to another term of imprisonment, unless an applicable statute requires that the term be consecutive. As used in this paragraph, 'unlawful sentence' means the imposition of a sentence not authorized by law or the imposition of a sentence based upon an unlawful order of the court which strikes or otherwise modifies the effect of an enhancement or prior conviction.

"(11) An order recusing the district attorney pursuant to Section 1424.

"(b) If, pursuant to paragraph (8) of subdivision (a), the people prosecute an appeal to decision, or any review of such decision, it shall be binding upon them and they shall be prohibited from refiling the case which was appealed.

"(c) When an appeal is taken pursuant to paragraph (7) of subdivision (a), the court may review the order granting the defendant's motion to return or suppress property or evidence made at a special hearing as provided in this code.

"(d) Nothing contained in this section shall be construed to authorize an appeal from an order granting probation. Instead, the people may seek appellate review of any grant of probation, whether or not the court imposes sentence, by means of a petition for a writ of mandate or prohibition which is filed within 60 days after probation is granted. The review of any grant of probation shall include review of any order underlying the grant of probation."

■ In *People v. Superior Court (Stanley)*, the California Supreme Court held: "If the prosecution has not been granted by statute a right to appeal, review of any alleged error may be sought by a petition for writ of mandate *only* when a trial court has acted in excess of its jurisdiction and the need for such review outweighs the risk of harassment of the accused. [Citations.] Mandate is not available to the prosecution for review of 'ordinary judicial error' [citation] or even 'egregiously erroneous' orders [citations] when the order or ruling 'on its face is a timely exercise of a well-established statutory power of trial courts . . . from which no appeal is provided in section 1238.' [Citation.]"[8]

"Since *Stanley* [was decided more than 25 years ago], courts have generally taken a broad view of 'jurisdiction' as it relates to a petition for writ of mandate by the prosecution."[9] Some courts have even interpreted the definition of the phrase "excess of jurisdiction" to mean " 'any misinterpretation, misapplication or refusal to follow applicable constitutional, statutory or case law authority.' [Citations.]"[10]

■ It is not completely settled what it means to find a court acted in "excess of jurisdiction" in the context of deciding whether the People are entitled to writ review of a trial court's order or ruling. Several Court of Appeal decisions appear to construe the term "jurisdiction" in the clause "excess of jurisdiction" as something broader than the trial court's personal and subject matter jurisdiction over the matter being considered for writ review.[11] On the other hand, a few have adhered to this narrower definition of the term.[12] Clearly, the trial court here had both personal and subject matter jurisdiction in this proceeding and to consider whether to admit or exclude this evidence. Consequently, if jurisdiction is given its more precise and

---

[8] *People v. Superior Court (Stanley)* (1968) 24 Cal.3d 622, 625–626 [156 Cal.Rptr. 626, 596 P.2d 691], footnote omitted.

[9] *People v. Superior Court (Broderick)* (1991) 231 Cal.App.3d 584, 586–587, 589 [282 Cal.Rptr. 418] (trial court's order quashing subpoenas duces tecum to mental health professionals on the ground "they violated [the defendant]'s state constitutional privilege against self-incrimination" was reviewable by writ of mandate).

[10] *People v. Superior Court (Manuel G.)* (2002) 104 Cal.App.4th 915, 919–921, 925 [128 Cal.Rptr.2d 794] (trial court's order granting the petition of a minor to seal his juvenile records pursuant to Welfare and Institutions Code section 781 was reviewable by writ of mandate).

[11] See, e.g., *People v. Superior Court (Manual G.)*, *supra*, 104 Cal.App.4th at page 925; *People v. Superior Court (Broderick)*, *supra*, 231 Cal.App.3d at page 589.

[12] See, e.g., *People v. Superior Court (Levy)* (1976) 18 Cal.3d 248, 252 [133 Cal.Rptr. 624, 555 P.2d 633] (order disclosing of confidential informant is not in excess of jurisdiction but merely ordinary error); *People v. Municipal Court (Kong)* (1981) 122 Cal.App.3d 176, 181–183 [175 Cal.Rptr. 861] (court did not act in excess of jurisdiction in determining, "after a post-indictment preliminary hearing, that six crimes charged as felonies should be considered misdemeanors").

narrower construction, it is readily apparent the court was *not* acting in excess of its jurisdiction and writ relief is unavailable to the prosecution.

■ Rather than depending on this narrower version of jurisdiction, however, we ask whether what the trial court did here in deciding not to hold a full-scale *Kelly-Frye* hearing was in excess of its jurisdiction under the broader definition. This broader definition focuses on whether the court had the *power* to reach the result it did, that is, whether it was empowered to afford the particular relief or issue the particular order or make the particular ruling it did. If "the order or ruling 'on its face is a timely exercise of a well-established statutory power of trial courts . . . from which no appeal is provided,' "[13] then the prosecution is denied the opportunity for writ relief. And the prosecution is denied that opportunity, even if the court erred or egregiously erred in exercising that power and making that order or ruling.[14] That is, it need not be a correct result, it need only be a result the trial court is authorized to reach. If so, the order or ruling is outside the proper scope of appellate review by way of writ as well as appeal.

The facts and rationale of the Supreme Court's controlling decision in *People v. Superior Court (Stanley)* are helpful in drawing the line between "ordinary judicial error" and judicial actions "in excess of jurisdiction." In that case the trial court had granted the defense a change of venue and the prosecution sought a writ of mandate to compel the trial be held in the county where the crime occurred.[15] In its unanimous opinion, the Supreme Court first found the trial court had legal authority to order a change of venue. It then drew the distinction: "The prosecution challenges the *decision* of the trial court rather than its *authority* to order the change of venue. This is an impermissible challenge to 'ordinary judicial error' for which mandate does not lie."[16] In other words, the prosecution challenged the *correctness* of the result the trial court reached rather than the court's *legal authority* to reach that result. In *Stanley*, the trial court was empowered to reach the result it did, that is, to *grant* a change of venue. Thus, the appellate courts lacked the power to grant the prosecution appellate review of that result and reverse it, no matter how wrong the trial court may have been in granting that change of venue. (Concededly, the Supreme Court appeared to agree with the result in that case, but that is not the basis nor effect of its decision which specifically addressed "whether the prosecution *may* petition for a writ of mandate,"[17] not whether the writ should be denied after a review of the merits of that petition.)

---

[13] *People v. Superior Court (Stanley), supra,* 24 Cal.3d at page 626 and footnote 3.

[14] *People v. Superior Court (Stanley), supra,* 24 Cal.3d at page 626.

[15] *People v. Superior Court (Stanley), supra,* 24 Cal.3d at page 625.

[16] *People v. Superior Court (Stanley), supra,* 24 Cal.3d at page 626, italics added.

[17] *People v. Superior Court (Stanley), supra,* 24 Cal.3d at page 624, italics added.

It is significant, however, to note how the high court distinguished an earlier Court of Appeal opinion, *People v. Superior Court (Thompson)*,[18] which had considered and then granted a prosecutor's petition challenging a trial court order transferring venue. Rather than disapproving that decision on grounds the trial court's ruling was authorized and thus not challengeable by the prosecution, the high court went deeper and upheld the prosecution's right to petition for and receive writ relief under the particular circumstances of the *Thompson* case.[19] It held the trial court's failure to consider the evidence before it and render its own decision based on the court's own findings meant its action in granting transfer was "in excess of jurisdiction." As the court explained, "the trial court granted a change of venue despite its expressed belief that the action was unnecessary. In effect, it abdicated its duty to exercise discretion and instead left to the higher courts the determination as to whether or not a venue change was actually necessary. [Citation.] Such conduct was plainly in excess of that court's jurisdiction because the court failed to act as a court at all."[20] The trial court evidently construed the statute authorizing a change of venue to *require* such a change if the defense requested it, even if the court found no evidence supporting that request.

 Thus, the Supreme Court's *Stanley* decision can be read to broaden the concept of "excess of jurisdiction" one step further. To preclude writ review by the prosecution, not only must the trial court have reached an authorized result, but it must have exercised whatever level of discretion it is authorized to exercise in reaching that result. However, elsewhere in the *Stanley* opinion the Supreme Court makes it abundantly clear the trial court need not have exercised that discretion correctly in order to avoid review at the instance of the prosecution. Had the trial court in the *Stanley* case found the evidence before it supported a change in venue the Supreme Court presumably would have disapproved the appellate court's intervention on behalf of the prosecution. At worst, that would have amounted to "ordinary judicial error."

Decisions issued by Courts of Appeal allowing mandate relief to the prosecution further illustrate this dividing line. Such relief has been granted when a trial court belatedly entertained a defendant's 1538.5 motion which the statutory scheme did not permit,[21] when a court imposed an unauthorized sentence under the wrong statute,[22] when a court issued an unauthorized order deferring a case for six months with the understanding the prosecution would

---

[18] *People v. Superior Court (Thompson)* 16 Cal.App.3d 811, 818 [94 Cal.Rptr. 342].

[19] The Supreme Court did disapprove*Thompson*, however, on another ground "[t]o the extent" it was "inconsistent with the views expressed" in *Stanley*. (*People v. Superior Court (Stanley), supra*, 24 Cal.3d at p. 627 & fn. 5.)

[20] *People v. Superior Court (Stanley), supra*, 24 Cal.3d at page 627.

[21] *People v. Superior Court (Edmonds)* (1971) 4 Cal.3d 605, 609 [94 Cal.Rptr. 250, 483 P.2d 1202].

[22] *People v. Superior Court (Duran)* (1978) 84 Cal.App.3d 480, 483–486 [148 Cal.Rptr. 698].

be dismissed if the defendant behaved,[23] when a court struck a special circumstance allegation under a statute which did not authorize that action,[24] and when a court contrary to statute vacated a guilty plea on its own motion after the defendant failed to request such relief.[25]

The courts likewise have allowed writ review in situations where the appellate court finds a trial court acted "in excess of its jurisdiction" by making a decision without hearing evidence when such evidence is required before making that decision. The court does not act in excess of jurisdiction, however, if it makes an erroneous decision after holding the required hearing and hearing evidence. In *People v. Superior Court (Beasley)*,[26] for instance, the trial court ignored a statute requiring repeat drunk drivers to receive minimum one-year sentences and granted probation. Without hearing any evidence as to jail conditions or defendant's physical condition, the trial court concluded he would suffer cruel and unusual punishment if confined. The prosecutor sought and the appellate court granted writ relief premised on the absence of any evidence in the record supporting a finding of cruel and unusual punishment.[27]

Likewise in *People v. Superior Court (Himmelsbach)*[28] the appellate court intervened via a writ because the trial court failed to follow a statute by asserting constitutional grounds without hearing any evidence to support that constitutional exception. In that case, the trial court had granted probation to the son of the local district attorney for offenses involving the possession and use of explosives, despite a statute prohibiting probation for some of those offenses. The trial court did so because it *felt* this defendant, because of his relationship to the district attorney, would be in serious danger if confined in state prison.[29] While conceding it was possible this defendant would suffer cruel and unusual punishment if sent to prison, the appellate court found *no evidence whatsoever* in the record supporting the trial court's feeling this would be the case, or that the prison was unable to provide him with reasonable protection from any such threats.[30] (To the extent there was evidence before the trial court on this issue, it supported a conclusion the

---

[23] *People v. Municipal Court (Gelardi)* (1978) 84 Cal.Ap.3d 692, 695–670 [149 Cal.Rptr. 30].

[24] *People v. Superior Court (Brodie)* (1975) 48 Cal.App.3d 195, 198–201 [121 Cal.Rptr. 732].

[25] *People v. Thompson* (1970) 10 Cal.App.3d 129, 136–137 [88 Cal.Rptr. 753].

[26] *People v. Superior Court (Beasley)* (1984) 159 Cal.App.3d 131 [205 Cal.Rptr. 413].

[27] *People v. Superior Court (Beasley), supra,* 159 Cal.App.3d at pages 136–137.

[28] *People v. Superior Court (Himmelsbach)* (1986) 186 Cal.App.3d 524 [230 Cal.Rptr. 890], disapproved on another ground in *People v. Norrell* (1996) 13 Cal.4th 1, 7, footnote 3 [51 Cal.Rptr.2d 429, 913 P.2d 458].

[29] *People v. Superior Court (Himmelsbach), supra,* 186 Cal.App.3d at pages 528–530.

[30] *People v. Superior Court (Himmelsbach), supra,* 186 Cal.App.3d at pages 534–535.

prison could protect him from other prisoners.)[31] The appellate court therefore found the trial court's order granting probation writable and granted the writ.[32]

*People v. Municipal Court (Bonner)*,[33] relied on by the People, also involves a complete lack of a factual showing by the defense, this time to support the trial court's exercise of its discretion. There the trial court ordered the prosecution to produce an officer's report despite the fact the defense had made no showing it satisfied the criteria for requiring that production. The appellate court heard and granted a writ, explaining, "[T]he error of which the People complain in the case at bench is no ordinary judicial error. . . . [R]eal party made no showing whatever in support of her request for the unrelated reports prepared by Officer Condon. Under existing law, therefore, the municipal court had no authority to order the production of those records, and its doing so constituted an act in excess of jurisdiction."[34] Thus, a result the trial court was authorized to reach if the defense made a factual showing and then exercised its discretion to do so, nonetheless was subject to a prosecution writ because that court acted without any showing whatsoever.

■ In this case, unlike *People v. Municipal Court (Bonner)* and like cases, both sides made showings on the issue before the court—whether a *Kelly-Frye* hearing was required before admitting this particular evidence. The trial court was asked to decide whether a *Kelly-Frye* hearing was necessary concerning Maldonado's proposed expert testimony, which was based on the results of NMS's testing for the presence of cocaine in samples from oral, vaginal and rectal swabs. Based on the showings made by both sides, including conflicting expert testimony, the court found there was no new scientific methodology at issue here and the methodology NMS used was generally accepted in the scientific community. Consequently, the court decided there was no need for a *Kelly-Frye* hearing. Erroneous or not, that decision was not in excess of jurisdiction.

For this reason, we conclude writ review is not available to the prosecution under the circumstances presented here. The result the trial court reached was legally authorized. The law does not mandate a trial court hold a full-scale *Kelly-Frye* hearing just because one side or the other requests it. Rather a trial court is legally entitled to decide against holding such a hearing after considering whether this time-consuming step is warranted. Nor did the trial court misinterpret, misapply or refuse to follow applicable statutory or case

---

[31] People v. *Superior Court (Himmelsbach), supra*, 186 Cal.App.3d at page 534, footnote 5.

[32] People v. *Superior Court (Himmelsbach), supra*, 186 Cal.App.3d at page 535.

[33] *People v. Municipal Court (Bonner)* (1980) 104 Cal.App.3d 685 [163 Cal.Rptr. 822].

[34] *People v. Municipal Court (Bonner), supra*, 104 Cal.App.3d at page 694.

law authority. At the worst, the court erroneously weighed the two submissions before it when applying the correct legal standard. Notably, the trial court here did not reject the prosecution's request for a *Kelly-Frye* hearing out of hand. Rather, the court considered the documentary showing submitted by both sides and heard extensive argument. Only after that lengthy review and after weighing both sides' submissions, did the trial court decide the special showing required before a full scale *Kelly-Frye* hearing is warranted had not been met. This court or another appellate court might consider that decision erroneous, but it is certainly not "in excess of jurisdiction" and thus not "writable." At worst, it was an erroneous exercise of the court's jurisdiction.

We need not and do not reach the question whether a trial court's outright refusal to consider a prosecution request for a *Kelly-Frye* hearing, not allowing submission of supporting evidence or argument or not reading the evidence submitted, would be an act "in excess of jurisdiction" and thus writable. But when the trial court, as it did here, accepts and reads the prosecution's evidence and the defendant's response, then hears and considers argument on the threshold question of whether a *Kelly-Frye* hearing is required, it is a very different matter. Were we to consider the trial court's decision after such a hearing to be writable, then it would be hard to turn aside the prosecution's writ petition complaining the trial court was "in excess of jurisdiction" if it ruled after a full-scale *Kelly-Frye* hearing that this evidence was admissible. And if these evidentiary decisions are to be writable, why not every other ruling to admit evidence the prosecution would prefer to see excluded—or to exclude evidence it wanted to introduce.

In deciding whether the prosecution is entitled to appellate review of this particular decision via a writ, the issue is not whether the trial court abused its discretion in deciding no full-scale *Kelly-Frye* hearing was needed. Nor is the issue whether the trial court lacked substantial evidence to support its ruling. These are both standards of appellate review. The issue here is whether appellate review is to be allowed at all.

If every trial court order or ruling which constituted an abuse of discretion or failed to be supported by substantial evidence qualified for writ review at the instance of the prosecution, it would completely defeat the legislative policy that frowns on—and seeks to sharply circumscribe—appellate review by the prosecution in criminal cases. The defendant's speedy trial rights are impaired every time an appellate court intervenes, especially during the pretrial or trial phases of a criminal case. It is one thing when the defendant decides the delay is worthwhile and files a writ petition. It is quite another when the People choose to do so. We are not inclined to expand the "in excess of jurisdiction" limitation on prosecution writ relief to embrace potentially erroneous evidentiary rulings.

## DISPOSITION

The petition for writ of mandate is denied and the writ discharged. The stay of trial previously issued by this court is lifted.

Woods, J., and Zelon, J., concurred.

A petition for a rehearing was denied April 3, 2006, and petitioner's petition for review by the Supreme Court was denied May 17, 2006, S142629.