Filed 2/28/14  In re J.W. CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re J.W., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>J.W.,<br><br>        Defendant and Appellant. | A139453<br><br>(Alameda County<br>Super. Ct. No. J170033) |

J.W. (appellant), born in 1997, challenges the juvenile court's jurisdictional and dispositional orders finding he committed first degree robbery (Pen. Code, § 212.5, subd. (a)[1]) and placing him on probation.  Appellant's counsel has filed a brief pursuant to *People v. Wende* (1979) 25 Cal.3d 436 and requests that we conduct an independent review of the record.  Appellant was informed of his right to file a supplemental brief and did not do so.  Having independently reviewed the record, we conclude there are no issues that require further briefing, and shall affirm the order.

**FACTUAL AND PROCEDURAL BACKGROUND**

On December 10, 2012, an original petition under Welfare and Institutions Code section 602 was filed in the San Francisco Superior Court alleging appellant committed

---

[1]All further statutory references are to the Penal Code unless otherwise stated.

1

first degree robbery (§ 212.5, subd. (a)). On June 3, 2013, following a contested jurisdictional hearing, the court found the allegation true. After the jurisdictional finding, the San Francisco County Superior Court transferred appellant's case to the Alameda County Superior Court, where appellant had been previously adjudged a ward of the court and placed on probation for being habitually truant and for failing to comply with the mandates of the District Attorney's Office Truancy Mediation Program. The Alameda County Superior Court ordered appellant be detained at the Juvenile Justice Center pending disposition and terminated his probation on the prior petition.

The petition was based on an incident that occurred on December 6, 2012. A little before 8:00 p.m. that evening, Jeffrey Wong was riding a Daly City Bay Area Rapid Transit (BART) train home from work. He was tired from having volunteered at a high school at 8:00 a.m. that morning, before working from 11:00 a.m. to 7:30 p.m. as a manager at a café. He was listening to music on his iPhone using headphones, falling asleep on and off while on the train. He held the iPhone in his hand, which was in his pocket, and periodically took it out to check the time. There were not a lot of people on the train. At the 24th and Mission BART station, three men came from the adjoining car and sat near him. One sat in front of Wong and the two others sat across the aisle from him to his right.

As the train neared Balboa Park station, the three men got up. At that point, "there was only one other passenger in the car with [Wong] besides the three [men]." One man, who was wearing a Raiders hat and a white shirt, and had "really big pudgy lips," stood in the aisle near Wong. Another man, who had dreadlocks and "really big," "big white eyes," stood by the back exit door. The third man, who wore a black leather jacket, stood at the entrance from the BART train to the BART station. Wong remained seated but felt "startled" as the men got up and stood in their positions.

As the train came to a stop and the door opened, the man in the Raiders hat who was standing nearby grabbed Wong's phone, snatched it out of his hand, and ran out of the train. Wong suffered a cut to his finger when he struggled to prevent the man from taking his iPhone. The three men exited and ran off together. Wong chased them, but the

three men went out through an emergency exit and the alarm sounded. Wong gave up pursuing the men and went to the station officer to report the incident.

The station officer "wired [Wong] over to a police officer," and Wong told the officer what occurred. Wong also told the officer that he had signed up for "iCloud" on his iPhone—an application that can be used to track the location of the phone. Wong described the three men to the officer, stating they were all African-American men and were "pretty dark." The first man had dreadlocks and was wearing a grey sweater with stripes and baggy blue jeans. He was not the one who took the phone. The second man was wearing a Raiders hat. The officer asked Wong if the "guy in the Raiders hat" was the one who had taken his iPhone, and Wong responded, "I think it was the guy in the Raiders hat." Wong told the officer that he "didn't get a catch of the third guy."

Wong's iPhone was tracked to the area of 239 Seneca Avenue, and several officers responded. Officers Dudley, Hunt, Antonian, and Gauf responded in a car that was driven by Gauf. When they arrived in the area, Dudley and Hunt exited the car and walked north into a school courtyard; Antonian stayed in the car with Gauf. Inside the schoolyard, Dudley and Hunt saw "three black males huddled somewhere in this area— this playground area (indicating)." Hunt shined a flashlight on them, and the three males ran. Dudley and Hunt chased after them. Seeing Dudley and Hunt begin to sprint inside the schoolyard, Antonian and Gauf drove to the other side of the school. Antonian and Gauf arrived in time to see three males jumping down from a fence bordering the school. Landing on the ground, the three males ran towards Gauf and Antonian. The two officers exited the car. Antonian identified himself as a police officer, drew his weapon, and told all three to get on the ground. Appellant and D.D. got on the ground, but D.A. kept running, headed toward Ocean Avenue. Hunt eventually found D.A. and pulled him out from under a nearby car. Dudley backtracked along the chase route. He discovered a plaid shirt, a faux black leather jacket, and a cell phone.

Police officers told Wong that they found individuals who fit the description he had given. Wong got into a patrol car with BART Police Officer Shean and went with him to see if he could identify any of them. At the first stop, the police presented D.A.

3

and asked Wong whether this was the person who had taken his phone. Wong "wasn't too sure." He "wasn't able to identify that person." Wong did not remember a cautionary admonition, but Shean testified that he gave Wong a standard admonishment from a card that he carried. Shean then took Wong to a second location a couple of blocks away where he was presented with D.D. and appellant. Wong testified that he was able to identify D.D. "as the person on the BART train because he had the dreads and the big distinctive white eyes." Even though D.D. was now wearing the Raiders hat, Wong was certain he was not the one who had taken his phone. Wong knew that the person who had taken his phone was the man who was wearing a Raiders hat on the train and had a white shirt and distinctive lips. Wong identified the phone that was recovered as his and used his password to unlock the phone.

At the close of the prosecution's case, defense counsel moved for a directed verdict (Welf. & Inst. Code, § 701.1). The court denied the motion "based upon the court's weighing of the evidence." The court was "satisfied that at this stage of the proceedings after weighing the evidence that the petitioner has met its burden of proof of showing all elements of the charges in the petition either based upon a direct activity of the minor or as an aider and abetter on both alternatives." The court therefore denied the motion.

Appellant's grandmother and appellant's cousin testified that D.A. admitted to being the one who took the phone.

After hearing the evidence and argument, the juvenile court found the State had proved beyond a reasonable doubt that appellant was the one who had taken Wong's iPhone. The court further stated, "it's also clear to the Court that liability would also rest based upon aiding and abetting." The court noted that the three men "stood up and in different locations and as soon as the iPhone was taken, all three left the BART train by the same exit and all three ran through the emergency exit and on to a street and then on to an area where police chased them." The court noted that police found the cell phone and a leather jacket worn by one of the three men in the same area. The court concluded, "[T]here was proof beyond a reasonable doubt that the three individuals involved in this

4

theft were in agreement as to an intent to commit a theft, in this case a robbery by force, from someone who may be carrying a cell phone." The court adjudged appellant a ward of the court, ordered 40 hours of community service, and released him to the custody of his grandmother. Appellant filed a notice of appeal on August 8, 2013.

## DISCUSSION

Appellant's counsel asserts there may be an arguable issue relating to a *Trombetta*/*Youngblood*/*Sivilla* motion[2] appellant filed below in which he argued the petition should be dismissed because the state failed to preserve exculpatory evidence. Specifically, appellant argued that BART's security videos, which he had made efforts to obtain, would have proven that he was not the person who took Wong's iPhone.

At the hearing on appellant's motion, BART police detective Mike Maes testified that he interviewed appellant and D.D. on December 6, 2012, as part of an investigation of a cell phone theft. During the interview, D.D. asked, "Do you guys . . . have the BART cameras for the BART?" D.D. denied he did "anything" and said, "And I mean, if you see it on the camera, obviously you know that I didn't do it." Appellant said "he was innocent as far as taking the iPhone," and said he wanted to have the BART video "to show that." From his conversations with appellant and D.D., Maes understood the video was important and might prove that appellant and D.D. were not involved in the crime. Maes testified that a Community Service Officer (CSO) was responsible for recovering BART videos. He testified, "You have to have the training to do it. . . . And so in this case it was left for a CSO to recover the video." The defense had marked as exhibit C a defense discovery request to the district attorney's office, served December 11, 2012, for the BART video. Appellant's exhibit D was a defense subpoena for these records, faxed to BART on December 13, 2012.

Officer Shean testified that he determined the incident "may have occurred in one of two cars [, car 363 or car 2564,] on the BART train that was involved." He "requested [the] video[s] be checked for both cars" by sending an email through BART email,

---

[2]*California v. Trombetta* (1984) 467 U.S. 479; *Arizona v. Youngblood* (1988) 488 U.S. 51; *United States v. Sivilla* (9th Cir. 2013) 714 F.3d 1168.

5

pursuant to standard protocol. It was later determined that car 363 was not a video car and that car 2564 was. Shean's responsibility was limited to sending an email requesting the video and noting in his report that he had done so.

Larry Reed, a BART civilian employee, was the only CSO employed by BART to recover videos requested by law enforcement. Reed worked four 10-hour days each week, Monday through Thursday. When he was gone, videos were not recovered. The video recordings on many of the BART trains were preserved for up to 72 hours. Here, the incident occurred on the evening of December 6, 2012, which was a Thursday. Reed therefore did not receive the request to preserve the videos until he returned to work Monday morning, more than 72 hours after the recording would have been made. When he returned to work and received the request, Reed determined he could not recover the video, even if it had existed. He testified that even though car 2564 had a camera, there was no guarantee that the camera was recording or that the images were being stored.

Reed further testified that BART has a procedure where a request may be deemed "critical." If the video is considered "critical," a lieutenant can call Reed at home and have him recover the video, or can ask Reed's boss, who is a Sergeant, to access it. If the Lieutenant has the knowledge, she can also access it herself. In Reed's experience, "critical" incidents were limited to shootings or deaths.

The juvenile court denied the motion. The court found that the BART agents had acted in good faith and that it was unclear whether a recording was actually made or what the quality of any recording would have been. Accordingly, the court was not persuaded that the contested evidence "possess[ed] an exculpatory value that was apparent before it was destroyed . . . ." The court noted that the evidence might even have been inculpatory.

It is well established that the police have no obligation to collect evidence for the defense. (*People v. Holt* (1997) 15 Cal.4th 619, 664; *People v. Wimberly* (1992) 5 Cal.App.4th 773, 791.) However, "[l]aw enforcement agencies have a duty, under the due process clause of the Fourteenth Amendment, to preserve evidence 'that might be expected to play a significant role in the suspect's defense.' [Citations.] To fall within

6

the scope of this duty, the evidence 'must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.' [Citations.]" (*People v. Roybal* (1998) 19 Cal.4th 481, 509–510, quoting *California v. Trombetta*, *supra*, 467 U.S. at pp. 488, 489.) " '[U]nless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law.' " (*People v. Hines* (1997) 15 Cal.4th 997, 1042, quoting *Arizona v. Youngblood*, *supra*, 488 U.S at p. 58.) Negligence does not constitute bad faith. (*Arizona v. Youngblood*, *supra*, 488 U.S. at p. 58.)

Applying those legal principles to the case before us, we conclude that the denial of appellant's *Trombetta*/*Youngblood*/*Sivilla* motion does not raise an issue that requires further briefing. We have examined the entire record and are satisfied that appellant's counsel has fully complied with his responsibilities and that no arguable issues exist. (See *People v. Wende*, *supra*, 25 Cal.3d 436; *People v. Kelly* (2006) 40 Cal.4th 106.)

**DISPOSITION**

The judgment is affirmed.

_____
McGuiness, P.J.


We concur:


_____
Pollak, J.


_____
Siggins, J.


7